300 So.2d 870 (1974)
Flossye STEWART, Plaintiff-Appellee,
v.
GIBSON PRODUCTS COMPANY OF NATCHITOCHES PARISH LOUISIANA, INC., et al., Defendants-Appellants.
No. 4628.
Court of Appeal of Louisiana, Third Circuit.
September 11, 1974.
*871 Brittain & Williams by Jack O. Brittain, Natchitoches, for defendants-appellants, Beall's and Myron's Shoe Store.
James A. Bolen, Jr., Alexandria, for defendant-appellant, Morgan and Lindsey.
Lunn, Irion, Switzer, Johnson & Salley by Charles W. Salley, Shreveport, for defendant-appellant, Gibson Products.
Cook, Clark, Egan, Yancey & King, by Gordon E. Rountree, Shreveport, for defendant-appellee, Varner.
Whitehead & McCoy, by Kenneth D. McCoy, Jr., Natchitoches, for plaintiff-appellee.
Watson, Murchison, Crews & Arthur, by William P. Crews, Jr., Natchitoches, for defendant-appellee.
Before HOOD, MILLER and DOMENGEAUX, JJ.
MILLER, Judge.
Defendants Gibson Products Company of Natchitoches Parish, Louisiana, Inc., Morgan & Lindsey, Inc., Volume Shoe Corporation, d/b/a Myron's Shoe Store, and W. F. Beall Corporation, appeal from the judgment awarding plaintiff Flossye Stewart damages for personal injuries sustained by her when she fell or was knocked down while watching or participating in a Labor Day promotion sponsored by the four defendants. We reverse.
The Labor Day (September 7, 1971) Spectacular was well advertised by newspaper and radio featuring marked down prices on certain advertised items. The Spectacular centered around an air drop of *872 2400 ping-pong ballsabout half to be dropped at 10 a. m. and half at 2 p. m. The balls were marked with discounts ranging from 5% to 25%, some of which could be applied to the purchase of merchandise at Gibsons, some at Morgan & Lindsey, some at Myron's, and some at Beall's. Additionally two balls had a marked cash value of $25.
Mrs. Stewart, a person of 70 years of age, was visiting Mrs. Mason, her sister, in Natchitoches and heard the radio promotions. She and her sister decided to go see or participate in the event.[1] They left *873 Mrs. Mason's home at about 9 a. m. and drove to the shopping center. Mrs. Mason paid a bill at Morgan & Lindsey, then both shopped in Gibson's but were unable to find the item which Mrs. Stewart wanted to purchase. Sometime before 10 a. m., the exact time is in dispute, plaintiff and her sister walked out the front door of Gibson's and proceeded toward Mrs. Stewart's car.
The trial court's statement of facts relates that the ladies started "... walking to the automobile which was parked in the appropriate parking area immediately in front of the four stores in question. While walking toward the car the plaintiff heard and then observed the airplane fly over the parking lot releasing several dozen ping-pong balls.
"At this particular time there were approximately 1500 to 2000 persons milling about the parking lot. Several witnesses testified as to the number of persons and the reaction of the crowd as the balls were dropped and landed in the throng of persons. The court finds as a matter of fact that the younger members of the crowd became excited and began competing for the balls in a very determined manner by shoving, pushing and running....
"In the melee that followed, the plaintiff was knocked down and suffered a ... broken right wrist and broken hip."
The trial court then quoted at length from Volume 2B, Frumer, Louis, Personal Injury, § 1.01 et seq., verbo "Crowds", and from "The Duty to Control the Conduct of Another", Harper & Kime, 43 Yale L.J. 886, 903 (1934).
The court then held that "the four participating stores failed in their duty to provide adequate protective measures to the elderly plaintiff and therefore she is entitled to be recompensed for her injuries." No Louisiana law or cases were cited or discussed. The doctrine of contributory negligence was not mentioned. Damages were set at $75,000 for personal injuries and $8,019.50 for hospital and medical expenses.
As part of the Labor Day promotion, the stores arranged remote live radio coverage of the event. The radio broadcast was carried over loud speakers in Gibson's store, and over loud speakers placed so that those in the parking lot would hear the "play by play" reporting of the event. The radio station and loud speakers inside and outside the stores reported the length of time to the air drop. It was carefully *874 explained to those listening that the plane would make three passes, the first to be a practice run at which some fifty balls were to be dropped to measure the drift caused by the wind. It was explained that these balls had no discount value at the stores and that balls with marked discounts would be dropped on the next two passes.
After the practice run it was announced that the next run would be from west to east and would arrive in five minutes. At the appointed time the run was commenced and approximately 600 balls were dropped. The third and final run commenced some five minutes later, and an additional 600 balls were dropped.
This promotion had been successfully and safely used on July 4, 1971. Some testimony indicated that it had been used on Labor Day, 1970, but other testimony suggested that the 1970 promotion was limited to a parachute jump. In either event, there were no accidents or injuries related to that promotion.
Only Mrs. Stewart testified that she was knocked down by a young man whom she saw only while falling down. At trial she testified that she was hit "... and I guess it must have thrown me up in the air...." Tr. 381. But at her discovery deposition and at trial (Tr. 395) she admitted that "... the boy may not have even known he had hit (me)." In her deposition at page 12, Mrs. Stewart admitted that she didn't know what part of her body was hit. Neither did she know what part of the other person made contact with her.
Mrs. Mason testified by deposition (referred to at Tr. 335) that her sister, the plaintiff, really didn't know what happened. This was changed at trial to state that her sister knew she had been knocked down. Nevertheless Mrs. Mason did not deny having made the former statement in her deposition.
Attorney John Whitaker was in the parking lot campaigning for a political office among the assembled crowd. He saw Mrs. Stewart in the crowd several minutes before he saw a crowd of boys go through the area and shortly thereafter he saw Mrs. Stewart on the ground. No one else was struck. Whitaker did not see Mrs. Stewart fall or get knocked to the ground, but he surmised that someone knocked Mrs. Stewart down.
Whitaker explained that the plane made three runs from west to east. When he saw boys running along the line of flight of the plane, he grabbed his two young children and moved away from the ping-pong balls to avoid the crowd. Tr. 272.
Mrs. Stewart's testimony that she was knocked to the ground was accepted by the trial judge. Although there is no corroborating eye-witness support for this fact, we find no manifest error in that determination.
We do find manifest error in the factual determination that the accident happened immediately after plaintiff and her sister departed Gibson's for their car. This finding is contrary to these ladies stated purpose of going to the shopping center to witness the event and to Mrs. Stewart's testimony that she intended to pick up a ping-pong ball if one would come near her. That factual determination is contrary to testimony of plaintiff's witnesses Mr. and Mrs. John Whitaker. Both saw Mrs. Stewart standing around waiting for the drop, one a few minutes before and the other twenty minutes before. Tr. 268, 269, 286, 297, 292, 293. Plaintiff's testimony on this point is also contradicted by her witness Mr. Duane Holley who was standing around talking to plaintiff's sister before the drop. Tr. 295.
We find as a fact that while plaintiff and her sister were in Gibson's store, they heard the radio and public address system announcements advising that the plane would arrive; that their stated purpose in going to the shopping center was to attend this event, and as Mrs. Stewart put it "... we was down there." (Mrs. Stewart's deposition page 75.)
*875 The accident occurred after the third drop. Plaintiff's witness Mrs. Whitaker so testified at Tr. 289 and 290. Plaintiff's witness Dr. Muns also testified that the show was over when he saw the crowd gather around Mrs. Stewart and he got in his car and left. Tr. 245,6. He drove to the parking lot to get ping-pong balls, and nothing suggests that he left before the well announced last run.
These are plaintiff's witnesses and the trial court accepted some of their testimony in making his findings of fact. The trial court did not state that Dr. Muns, Mr. Holley and Mrs. Whitaker were not credible witnesses. The trial court did not explain why plaintiff's and her sister's self-serving conclusion was accepted and the above referred to testimony by plaintiff's witnesses was rejected.
Plaintiff and her witnesses established that plaintiff was positioned in the area where a heavy concentration of balls was likely to fall and where they actually fell. Mrs. Stewart described the balls falling as looking like snow.
Since Mrs. Stewart had witnessed two prior runs by the planeone test run, and one where the balls fell all over the lot she had an opportunity to move to her car or to move to the sidewalk where all witnesses agreed most elderly people were standing.
Relevant here is the testimony of Mrs. Stewart at page 41 of her deposition:
Q. Any particular reason that you stopped when you saw that plane?
A. Well, I guessI saw that crowd is what scared me.
Q. Now, what about the crowd scared you?
A. Well, I was afraid I would get hit. You know, if I ran like they did; I didn't want to be out there as old as I was.
Q. Did you feel that where you were standing you were safe?
A. Nobody was safe down there in that place. I don't know why there wasn't more hit.
Q. The point I am trying to make is you indicated that you saw the plane and stopped, and then you saw the crowd and they were running?
A. If I could have got back in the store, I would have sure have got there.
Q. Did you make any effort to get back there?
A. No, sir.
Q. Did you make any effort to go and get in your car?
A. I couldn't no, sir, there was too many people out there. Well, I was hit too quick; I couldn't have gone nowhere.
Of all the substantive torts problems with which a judge must contend, the most exasperting and elusive is that of determining how far legal protection should extend. The difficulty of this job becomes fully apparent only when the trier must face it at the time when he is saddled with the responsibility of deciding a specific controversy. Until then the permissible extent to which law can afford protection is regarded merely as something that is determinable through recourse to an assortment of generalities that parade in the law books under the banner of "proximate cause." Malone, "Ruminations on Dixie Drive It Yourself versus American Beverage Company," 30 La.L.Rev. 363 (1970) [hereinafter cited as Ruminations]. Of particular significance to the instant case is the collateral question of whether "foreseeability of harm" is an essential element in a finding of probable cause, and there are Louisiana decisions supporting either position. See 25 Tul.L.Rev. 419 (1951). For a discussion of the foreseeability problem in other jurisdictions, see Annotation, 100 A.L.R.2d 942 (1965).
*876 Conflicting decision by the courts provided little guidance for an intelligent determination of causation in a negligence case, prompting Justice (now Chief Justice) Sanders to note that "[I]n this state and elsewhere, the subject of responsible causation is obscured by a smog of empty phrases and verbal intricacies. [Citations omitted.] It is difficult, if not impossible, to reconcile the decisions that have dealt with it." Spiers v. Consolidated Company, 241 La. 1012, 132 So.2d 879, 885 (1961). This dissatisfaction with past means of discerning liability led to the landmark decision, Dixie Drive It Yourself System v. American Beverage Company, 242 La. 471, 137 So.2d 298 (1962), in which the Court, citing with approval from a Comment in 16 La.L.Rev. 391 (1956), set out a new test for determining causation in negligence involving violation of a statute. According to the Court "... [s]ince the law never gives absolute protection to any interest, recovery will be allowed only if the rule of law on which the plaintiff relies includes within its limits protection against the particular risk that plaintiff's interest encountered. This determination of the particular risks to the plaintiff that fall within the ambit of protection of the rule of law on which plaintiff relies is the determination of the issue of proximate cause ...." Dixie, supra at 305 See case comment, 23 La.L.Rev. 142 (1962).
In the years following this decision, some appellate courts used the Dixie "duty-risk" approach in determining the existence of liability for violation of court-made rules. 33 La.L.Rev. 443, 446 (1973). In one such case, Dartez v. City of Sulphur, 179 So.2d 482, 484 (La.App. 3 Cir. 1965), this circuit spelled out Dixie's "duty-risk" approach to liability in these terms"... for the negligence of a defendant to be a `legal' or `proximate' cause of injuries sustained by another, (1) the defendant's negligence must be a cause-in-fact of the injured person's injuries, and (2) the risk and harm encountered by the injured person must fall within the scope of protection afforded by the duty to others breached by the defendant's negligence."
Application of the "duty-risk" approach has received favorable comment from legal scholars. Professor Wex Malone, for instance, approved the application of the Dixie approach to all cases of liability, stating that the real value in that approach rested in the fact that cause and legal duty were considered as separate matters and that considerations of policy were "... liberated from the chrysallis of causation jargon and allowed to stand on their own footing." Malone, Ruminations, supra, p. 377. In 1972, the Louisiana Supreme Court accepted the "duty-risk" evaluation of liability for all cases by holding that it should be utilized in cases involving a violation of jurisprudential law, noting that: "The same policy considerations which would motivate a legislative body to impose duties to protect from certain risks are applied by the court in making its determination." Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 623 (1972). Thus, the net effect of the Dixie/Hill rulings was to supplant the traditional proximate cause analysis previously prevalent in Louisiana's jurisprudence with a "duty-risk" approach to liability. Crawford, "Work of the Appellate Courts 1971-72Torts," 33 La.L.Rev. 206, 210 (1973).
We will discuss the following three issues:
1) Was the storeowners' conduct in sponsoring the ping-pong drop as an advertising promotion a cause-in-fact of plaintiff being pushed and injured by a crowd seeking to recover balls redeemable for merchandise?
2) Was the risk of harm to an elderly lady produced by a combination of the storeowners' act and that of unidentified members of a crowd assembled to participate in the drop, *877 within the scope of protection of the rule of law requiring shopowners to take protective measures and exercise reasonable care toward their business invitees?
3) Was plaintiff's conduct in participating in the affair below the standard to which she should have conformed for her own safety and was this conduct a legal contributing cause co-operating with the negligence of defendants to bring about plaintiff's injuries?

I
Liability does not attach unless the conduct complained of bears a causal connection in fact to the occurrence of the accident. Craig v. Burch, 228 So.2d 723, 729 (La.App. 1 Cir. 1969). If the acts of defendant were necessary antecedents to the consequences in question, they are a cause in fact of those consequences. This has become known as the "but for" or sine qua non rule. Arnold v. Griffith, 192 So. 761, 763 (La.App. 2 Cir. 1939); LaCas v. Hartford Accident & Indemnity Company, 152 So.2d 644 (La.App. 2 Cir. 1963). In determining cause in fact in a negligence case, causation should be considered by the trier of fact without reference to policy overtones that are involved in the case, and if plaintiff can show that he probably would not have suffered the harm complained of but for the defendant's conduct, he has carried the burden of proof on this question. Malone, Ruminations, supra, pp. 370-73. We find that the Labor Day Spectacular as advertised and conducted was a cause in fact of Mrs. Stewart's accident.

II
A finding that defendants' activity in sponsoring the ping-pong ball drop was the cause in fact of plaintiff's injuries does not establish liability; but only a prerequisite of liability. Additionally, it is necessary to ascertain whether defendant breached a legal duty imposed to protect against the particular risk involved. Hill v. Lundin & Associated, Inc., 260 La. 542, 256 So.2d 620, 622 (1972); Todd v. Aetna Casualty & Surety Company, 219 So.2d 538 (La.App. 3 Cir. 1969).

DUTY
A possessor of land who holds it open to the public is under a special relation giving rise to an obligation to protect against unreasonable risk of physical harm to those who enter in response to his invitation. Vegh v. Kaiser Aluminum & Chemical Corp., 259 So.2d 580 (La.App. 1 Cir. 1972); Currington v. Great American Insurance Company, 281 So.2d 150 (La. App. 3 Cir. 1973). Furthermore, a possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentional harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it. Restatement (Second) of Torts § 344 (1965). This duty is levied on the landowner who holds his premises open to the public on the theory that it is one of the prices he must pay for the economic benefit he hopes to or, in fact, does derive from the presence of the visitor on his premises. W. Prosser, "Handbook of The Law of Torts," 386 (4th Ed. 1971).

RISK
Since defendants as storeowners were under a duty toward plaintiff in her status as business invitee to protect her from unreasonable physical harm, it must be determined whether this duty encompasses the risk and harm plaintiff in fact *878 encountered upon their premises. Defendants strongly assert that injury to Mrs. Stewart was an event totally unforeseeable and accordingly no liability should attach. The cases cited in support of the proposition that foreseeability of risk is a precondition to liability are, at best, of doubtful precedential value in light of the fact that the Louisiana Supreme Court has recently held that foreseeability of harm on the part of defendant is not controlling on the determination of liability.
Foreseeability is not always a reliable guide, and certainly it is not the only criterion for determining whether there is a duty-risk relationship. Just because a risk may foreseeably arise by reason of conduct, it is not necesarily within the scope of the duty owed because of that conduct. Neither are all risks excluded from the scope of duty simply because they are unforeseeable. The ease of association of the injury with the rule relied upon, however, is always a proper inquiry. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620, 622 (1972).
Furthermore, it has been noted by a prominent authority of the "duty-risk" analysis question that "foreseeability may be a relevant factor for the judge to consider; other factors may be and are usually more important in the determination of the defendant's duty; the fact of risk in the particular case is what actually took place as a result of defendant's conduct, not what was foreseen by the actor as likely to take place, and it is this risk that must be brought into focus by the court's judgment on a duty issue." Green, "Duties, Risks, Causation Doctrines," 41 Tex.L.Rev. 42, 58 (1962).
In other words, a risk is within the duty owed to plaintiff if the event that caused the harm in hindsight appears to have been normal, not unusual, and closely related to the danger created by defendant's original conduct, even though, strictly speaking, it would not have been expected by a reasonable man in defendant's shoes. Moreover, an activity is an unreasonable risk against which the law affords protection if the magnitude of the risk outweighs the social utility of the complained of conduct. In a determination of the utility of defendant's conduct, the law gives great weight to the extent to which a defendant can advance his interest by an alternative, less dangerous, course of action. If an alternative relatively equally effective means is available creating less risk, defendant's action in pursing the original activity is regarded as unreasonable and hence within the scope of protection offered by law. Restatement (Second) of Torts §§ 281 (comment g), 291-92 (1965).
Pertinent to the instant case, is the fact that the only probable risk involved in a ping-pong drop was that the ardor of the participants who desired to "capture" the balls would incline them to be impatient, hasty, and careless in their movements at the time of the drop. This gave rise to the risk of harming themselves or others and it was this very risk which caused Mrs. Stewart's injuries.
While it is true that commerce is a vital necessity to our economic system and that "[p]resent day merchandising demands an attractiveness to a large patronage," [Bennett v. Sears, Roebuck & Company, 183 So.2d 757, 762 (La.App. 1 Cir. 1966)] the choice in this case is not common versus no commerce or crowds versus no crowds, as defendants seem to argue. Rather the issue concerns the proper means by which commerce should be conducted and crowds assembled, giving due regard to public safety. Relevant to this inquiry is an examination of the conduct the crowd is expected to exhibit once assembled and a distinction should be drawn between a crowd of spectators as in Bennett and a crowd of participants as is here involved. There is, for example, no negligence per se in sponsoring a football game to be attended by 80,000 spectators; however, the same may not be said for a promotion where pingpong *879 balls redeemable for merchandise are dropped on the playing field at half-time with an invitation to the assembled crowd to try to "capture" one or more balls.
Alternative, equally effective, means of advertising were available to defendant-merchants, which involved less risk of harm to their patrons. We find defendants' conduct, viewed in its most favorable light, to have been of marginal social utility. No investigation was conducted by defendants to determine the safety of a drop nor was advance preparation made for the large crowd defendants expected to attend. Had a safety investigation been made, defendants may well have discovered that not only was it likely that participants in the drop could be injured by enthusiastic and careless crowd movement, but also that injury received in an airplane drop had been the subject of litigation in another state. See Hicks v. M.H.A., Inc., 107 Ga.App. 290, 129 S.E.2d 817 (1963). There is no manifest error in the finding that the totality of the storeowners' conduct breached the duty of reasonable care owed to its business invitees. The resulting harm suffered by plaintiff is within the scope of protection offered by this rule of law.

III
Merchants are not insurers of their patrons' safety and a customer is under a duty to use ordinary care to avoid injury. Tripkovich v. Winn-Dixie Louisiana, Inc., 284 So.2d 80 (La.App. 4 Cir. 1973). We must determine whether or not Mrs. Stewart's conduct fell below the standard to which she should have reasonably conformed for her own protection. And was her conduct, if not reasonable, a legal contributing cause of her injuries? Henson v. Travelers Insurance Company, 228 So.2d 667 (La.App. 1 Cir. 1969); Restatement (Second) of Torts, § 463 (1965).
Mrs. Stewart involved herself in the Spectacular and participated in the drop. This was a contributing cause of her injuries. Yet the determinative question to answer is: did plaintiff's conduct fall below the standard the law requires her to exert for her own protection? To satisfy this legal standard of care, plaintiff must have conducted herself as would a reasonable person of age 70. She must recognize that greater caution for her safety is required because of the higher risk of serious harm to a person of age than to one of younger years. King v. Investment Equities, Inc., 264 So.2d 297 (La.App. 1 Cir. 1972); Restatement (Second) of Torts, § 283C (1965).
Contributory negligence is measured by the same standard as primary negligence [Theunissen v. Guidry, 244 La. 631, 153 So.2d 869 (1963)], and thus to determine the "reasonableness" of plaintiff's conduct, the risk of harm must be measured against the social utility of her conduct. A risk of harm is unreasonable if it is of such magnitude as to outweigh what the law regards as the utility of the conduct. See Restatement (Second) of Torts, § 291 (1965). Risking serious injury in a crowd of over 1000 on the chance of recovering a ping-pong ball redeemable for a discount on merchandise is below the standard of conduct this 70 year old plaintiff should have exercised for her own safety and protection. That plaintiff had not seen a "drop" before this Labor Day Spectacular is not conclusive. Most significant here is the fact that Mrs. Stewart was injured on the third drop of the balls. Witnessing two previous drops put her on notice of the extent of her risk. Plaintiff was under a duty to exercise reasonable care for her own safety. Her testimony acknowledged that she recognized the peril. Her contention that the accident happened before she recognized the peril was refuted by her witnesses.
In summary, recovery is denied because plaintiff is found to be contributorily negligent. The law refuses to allow one to shift to another a loss for which his own unreasonable conduct is in part responsible. Laney v. Stubbs, 217 So.2d 468, 473 (La.App. 1 Cir. 1968).
*880 The trial court judgment is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of all defendants rejecting plaintiff's demands at her costs both at the trial and appellate levels.
Reversed and rendered.
NOTES
[1] Since the trial judge did not mention this fact in his opinion, we quote some of Mrs. Stewart's and her sister's testimony.

From Mrs. Stewart's discovery deposition page 61.
Q. ... at the time that you went to the shopping center that morning you realized that there would be a ping-pong ball dropping that day sometime?
A. Yes, sir, I knew that.
Q. And that was one of the reasons that you went to the shopping center?
A. Yes sir. You know, I have always tried to, you know, do things like that because I have never been as old as I look now.
Q. And you realized that there might be an opportunity for you to obtain some of the ping pong balls and get some of the discounts and so forth?
A. Well, Iyes, sir, if there would have one come by me, yes, sir, I would have picked it up. Wouldn't you?
Same Depositionpage 75.
Q. Did you know what time of day this plane was to come over to drop those ping-pong balls; was that advertised over the radio?
A. I knew the time, yes, sir.
Q. You planned your trip to be there at the time that these ping-pong balls were going to be dropped?
A. Well, we was down there, yes, sir.
Q. That was part of your reason for going....
A. Yes, sir.
From Mrs. Stewart's testimony on direct 375.
Q. Was there any particular reason why you went to the shopping center?
A. Well, we had been hearing about that ping-pong ball drop, and we went down there to see that. But we did go down there for other things.
Again on direct examinationTr. 380, 381.
Q. Just so there is no confusion, you knew there was going to be a ping-pong ball drop?
A. Yes, sir, I sure did.
Q. That was one of the reasons you had gone there?
A. Yes, sir.
Q. And you intended to watch it?
A. Yes. sir.
Again on direct examinationTr. 378.
Q. ... When you left the store, was there any particular reason why you left the minute you did?
A. No, neither one of us had on our watch, and we knew when the plane was going to come over. But we didn't have on our watches.
Q. How did you know when the plane was going to come over?
A. I think it said it on the radio.
Q. When you left the store, were you leaving specifically because you thought a plane was coming over at that very minute, or were you leaving at that time for some other reason?
A. Well, no, sir, we didn't go out there for no other reason, we just went out therewe were invited and we went.
Mrs. Stewart's cross examinationTr. 402.
Q. You also knew before you went to the parking lot that day that older people have to take extra precautions not to fall down, because their bones are brittle and might be broken, didn't you?
A. I was always alert and went to any place I wanted to.
Testimony of Mrs. Vic Mason, plaintiff's sister.
On cross-examinationTr. 325.
Q. But at the time that you all came out of Gibson's or even while you were still in Gibson's, they were making announcements on the PA system?
A. I don't recall whether I heard that or not, it has been so long. All I know is that I heard it on the radio every few minutes.
Q. Mrs. Mason, isn't it a fact that even before you ever went out of Gibson's, you knew that the plane was about to come over?
A. Well, like I say, I didn't know what time it was, but we were through in Gibson's and we didn't have any other alternative, we didn't want to stay there, so we started out. But we did know that the balls were going to fall.
Q. And one of your purposes for being there that morning was to be there when the balls fell, is that right?
A. We knew they were going to fall at ten.
Q. The question was, one of your purposes for being there was to be there when the balls fell, isn't that right?
A. Yes, sir.
Q. And you planned to be on the outside when the balls fell?
A. Well, I am sure we did, or we wouldn't ....
* * * * *
Q. Do you remember this question being asked and you giving these answers, this is on page 78 and 79. Question: "Did you hear any loud speakers there in the parking lot or in any of the stores talking about the ping-pong drop while you were out there that day?" Answer: "The loud speakers." Question: "What was being said?" Answer: "Well, about the same thing the radio was saying." Do you remember those questions and answers?
A. That's what I said awhile ago, that it has been a long time, that I do not recall, if I heard them or didn't. But if I said that then (at the deposition), then that was right.
Mrs. Mason on cross examinationTr. 339.
Q. You had left your home a little after nine o'clock in the morning, on September 6, had you not?
A. That is right.
Q. And at the time you left your home, at that time, you knew you were going to the parking lot and there was going to be a ping-pong ball drop at ten o'clock in the morning, isn't that correct?
A. Yes, sir.
Q. As you were approaching the parking lot, isn't it a fact that you were sure that people would be there for that ping-pong ball drop in that parking lot?
A. Well, I felt sure they would be, they were inviting everybody in town over there.