ROSEMARY LEDET, Judge.
| ¶ This is a personal injury suit. The plaintiffs, Beverly Zaeher[1] and her husband, David Zaeher, brought this action against the defendant, Harrah’s New Orleans Management Company, d/b/a Har-rah’s New Orleans Jazz Casino Company, L.L.C., alleging that Mrs. Zaeher, while a guest at Harrah’s hotel, sustained injuries as a result of Harrah’s negligence. The Zachers subsequently amended their petition to name the correct legal entity, Jazz Casino, L.L.C., the owner and operator of Harrah’s New Orleans Casino.[2] Following a bench trial, the trial court found Har-rah’s liable and rendered judgment in the Zachers’ favor. For the reasons that follow, we reverse.
FACTUAL AND PROCEDURAL BACKGROUND
On February 8, 2010, the Zachers (Ohio residents) and two other family members — Mrs. Zacher’s sister, Barbara Toi-són (an Ohio resident), and Mr. Zacher’s brother, Leonard Zaeher (a Florida resident) — traveled together to NewLOrleans. The purpose of their trip was pleasure; Leonard Zaeher had received complementary rooms at Harrah’s hotel in New Orleans. By coincidence, their trip was on the same week that the City of New Orleans celebrated the Saints’ Super Bowl XLIV victory.
To celebrate the Saints’ Super Bowl victory, on the night of February 9, 2010, the City held a parade. The parade route was down Poydras Street; and it passed in front of Harrah’s complex. Immediately preceding the parade, Harrah’s co-hosted with Crown Crescent Distributing, L.L.C. (“Crown”), the distributing company for MillerCoors beers, a Black and Gold Super Bowl Party (the “Party”). For the Party, Crown provided the entertainment — the stage, the master of ceremonies (“M.C.”), and the band (Five Finger Discount). Harrah’s provided the venue — Fulton Square — and souvenirs — one thousand small black towels. Printed in gold on the towels was the following: the Harrah’s logo, a fleur de lis, the date of the Super Bowl (February 7, 2010), and “WE ARE THE CHAMPIONS.”[3] At that time, Fulton Square was a paved, courtyard-type outside area located behind Harrah’s casino building, but a part of Harrah’s complex.[4] The Party was open to the public.
^According to the Zachers, they saw a billboard near the front door of the Har-rah’s hotel at which they were staying advertising the Party and “free beer.”[5] *135 Mrs. Zacher testified that their group of four — her, her husband, her brother-in-law, and her sister — arrived at the Party at around 5:00 p.m. Mrs. Zacher described the Party as “very crowded;” she guessed that there were 500 people in the crowd.[6] She, however, testified that she did not see any security personnel present.
Mrs. Zacher testified that when they walked into Fulton Square, the M.C. was throwing t-shirts from the stage into the crowd. Due to her fear of large crowds coupled with the fact that t-shirts were being thrown, Mrs. Zacher testified that she remained in the back of the crowd while the rest of her group moved toward the front closer to the stage. She explained that the reason she believed it was t-shirts that were being thrown was because when they arrived she heard the M.C. announce that “T-shirts were going to be thrown.” Although she testified that she saw t-shirts being thrown, she could not identify what, if anything, was printed on the t-shirts. She described the t-shirts as “white rolled up T-shirt[s].” She saw no one unrolling or wearing the t-shirts.
Mr. Zacher expressly contradicted his wife’s testimony regarding whether the M.C. was already throwing t-shirts when they arrived at the Party. He testified that “[w]hat happened is we walked in and we are walking in the back, then she 14[Mrs. Zacher] seen them throwing the T-shirts. That’s why she stayed back, one of the reasons she stayed back, and one of the reasons we separated and went up front. But then she could have left, but she was back away from the crowds and she felt ... she was safe.” Mr. Zacher estimated that he saw a total of three to five t-shirts being thrown, but he aeknowl-edged that he could not say for sure how many t-shirts he saw being thrown. Nor could he identify what, if 'anything, was printed on the t-shirts. Nor did he see any one with a t-shirt besides the people on the stage.
According to the Zachers, the t-shirt throwing lasted for about ten to fifteen minutes before an unidentified gentleman knocked Mrs. Zacher to the ground while attempting to catch a t-shirt. According to Mrs. Zacher, the third t-shirt that was thrown from the stage landed near where she was standing and precipitated the accident. Describing how the accident occurred, she testified:
Well, they were throwing the T-shirts out. They were wrapped. And they went different directions. And I was in the back. And then ahead of me was a large man standing. I saw this T-shirt coming, and I thought my goodness, it’s going to go to him, and I couldn’t believe it would get back that far. And so he walked and jumped backwards to catch it. And he caught it. And then in the meantime he knocked me down to the ground.
She also testified it was “[l]ike he [the unknown man] just went after a football.” She acknowledged that the time between the M.C. throwing the third t-shirt and the guy in front of her trying to catch it and knocking her down was “[pjretty quick.”
No one witnessed Mrs. Zacher’s accident. The man who knocked Mrs. Zacher down — referred to by the trial court as “John Doe” or “Mr. Doe” — was never identified. Although Mr. Zacher and the other two family members did not Usee Mrs. Zacher fall, they came to her assis *136 tance and helped her off the ground shortly after the accident. They stayed in the actual area where the accident occurred for only about five minutes. No one from Harrah’s came to their assistance at that location.
With the assistance of her family members, Mrs. Zacher moved to a large potter on Fulton Street, where she could sit down. (There were no seats in Fulton Square; it was all standing.)[7] Mr. Zacher then ordered his brother, Leonard Zacher, to go to the stage area to seek assistance for his wife. Although Leonard Zacher did so, he was unable to get help from anyone there. According to the Zachers, after Leonard Zacher returned from the stage area, the M.C. immediately stopped throwing t-shirts. Mrs. Zacher explained that the reason they stopped was because “[e]vidently [her] brother-in-law told them” that someone was hurt. Mr. Zacher testified that the M.C. then started handing out the t-shirts by hand from the stage.
At 5:28 p.m. that day, both Harrah’s Emergency Medical Technician (“EMT”), and its security officer (report writer) prepared reports documenting Mrs. Zacher’s injuries. Mrs. Zacher testified that she injured her shoulder, ankle, and thigh. About an hour and a half after being treated by the EMT, Mrs. Zacher attended the parade with her family members; however, she was only able to stay at the parade a few minutes due to a combination of her shoulder pain and the cold weather.
IfiThe following day, Mrs. Zacher traveled "with her family members to Florida (Leonard Zacher’s home). On February 12, 2010, she was treated at an emergency room in Florida. Shortly thereafter, she returned to Ohio. On February 28, 2010, she began treatment with Dr. Robert Whitehead, an orthopedic specialist in Ohio. According to Dr. Whitehead’s deposition testimony, Mrs. Zacher provided him with the following history:
She told me that she was at a party that involved the Super Bowl. And she was at a hotel. And they were having a party outside the hotel. And they were shooting prizes out of this — or throwing prizes or shooting prizes out of a canon [sic]. I think they were maybe T-shirts or something like that. And one came near her. And a larger man was jumping for the prize and he ran into her and knocked her down, injuring her left shoulder.
On August 4, 2010, the Zachers filed suit against Harrah’s New Orleans Management Company, d/b/a Harrah’s New Orleans. In their petition, they averred that Mrs. Zacher’s injuries occurred as follows:
[W]hen she was run over by fellow patrons during a t-shirt promotion conducted by your defendant in the courtyard of your defendant’s property at 8 Canal Street in New Orleans, Louisiana to celebrate the New Orleans Saints Super Bowl XLIV victory. Specifically, your defendant used an air gun/cannon designed specifically for ejecting the t-shirts into crowds as a means of disbursing the t-shirts and in the process, created a chaotic, uncontrolled environment that resulted in your petitioner being stampeded by fellow patrons.[8]
l7The petition also alleged that Harrah’s was negligent in, inter alia, “creating a *137 dangerous and hazardous condition on its premises; and allowing a dangerous and hazardous conditions/event to occur on its property.”
On November 5, 2010, the Zachers amended their petition to name the correct defendant, Jazz Casino, L.L.C., the owner and operator of Harrah’s New Orleans Casino.[9] Their amended petition averred that the accident occurred at a “promotional event ... on Fulton Street adjacent to Harrah’s and/or JCC’s casino.”[10]
On December 7, 2010, Harrah’s answered the original and amending petition admitting its status as the owner and operator of the land based casino, but denying the other allegations of the petition. Harrah’s affirmatively averred that Mrs. Zacher’s injury was “caused by her own actions in allegedly putting herself into a jubilant, excited dense group of revelers.” Thereafter, Harrah’s filed a |smotion for summary judgment, which the trial court denied. On October 19, 2012, this court denied Harrah’s application for supervisory writ, seeking review of that ruling. Zacher v. Harrah’s New Orleans Management Co., 12-1501 (La.App. 4 Cir. 10/19/12) (unpub.).
On October 29, 2012, a one-day bench trial was held in this case. At trial, the Zachers called the following four witnesses: Michael Parr, Harrah’s Risk Manager; Stacey Dorsey, Harrah’s Director of Security and Transportation; Mrs. Zacher; and Mr. Zacher. At the close of the Zachers’ case, the trial court denied Har-rah’s motion for involuntary dismissal.[11] Harrah’s then called the following five witnesses: Karol Brandt, Harrah’s Sponsorship Specialist; Rudolph Leonard, Har-rah’s EMT; Darryl Bartney, Jr., Harrah’s security officer and the report writer; Mr. Dorsey (recalled); and Mr. Parr (recalled).
Given the factual nature of the instant dispute, we find it necessary to briefly outline the testimony of the five witnesses besides the plaintiffs, Mr. and Mrs. Zacher, who testified at trial.[12]

*138
(i) Michael Parr, Harrah’s Risk Manager.

• He did not attend the Party.
• Theoretically, he agreed that if there was an event where they were throwing shirts into a large crowd, it “probably could” open up risks to people in the crowd. He explained that “when you have a large crowd like that, there are a lot of people involved, and they’re all scrambling to get things. So there could be some possibilities that people would bump into each other or, you know, in their zeal to catch a T-shirt they would, you know, may have some problems.”
|fl* He agreed that if he had been consulted about throwing T-shirts or towels into the crowd, he, as risk manager, would have recommended that they not do so. He also agreed that if a Har-rah’s employee or security officer had seen such activity, he would have expected the employee or security officer to stop it.
• He could recall no event at which Har-rah’s staff actually threw objects. He explained that Harrah’s staff usually hands objects out to patrons.
• He testified that with the exception of Mrs. Zacher, there were no other reports of accident or injury on Harrah’s premises on the date of the Party.
(ii) Stacey Dorsey, Harrah’s Director of Security and Transportation:
• He arrived at the Party sometime after 3:00 p.m.
• He explained that Harrah’s had a private security force that it supplemented with Orleans Parish Criminal Sheriff Officers.
• On the day of the Party, which was a Tuesday, Harrah’s had between seventeen and nineteen security officers throughout its complex. On a Tuesday, the regular number of security officers that Harrah’s would have present was between twelve and fifteen. Although Harrah’s did not hire additional security for the Party itself, he testified that Harrah’s had extra security present that day because of the entire city-wide events that were taking place.
• He confirmed that the security officers who were working on the day of the Party were responsible for patrolling Fulton Square; they were “a part of the roving patrol, not specifically stationed at Fulton Square.”[13]
• Between 4:30 and 5:00 p.m. on the day of the Party (which was when the accident allegedly occurred), at least two security officers were present on Fulton Square. He, however, could not identify those officers by name. He identified the person who was most likely responsible for the security officers that day as Christopher Fernandez, who gave no statement and was not called as a witness at trial.
• For public events held outside, he instructs his staff to be aware of the event and to perhaps make extra patrols.
*139 |1(|* He explained that the only extra measure that Harrah’s takes regarding security on parade days — like Bacchus, Endymion, or Rex Parade days — is to add to the staff, which was done on the day of the Super Bowl parade. He did not feel that any extra measures were necessary for the Super Bowl parade day.
• He described the Party as a sponsorship deal, not a Harrah’s event.
• He disagreed with Mr. Parr regarding whether throwing “objects that might have some tangible value into a crowd is a dangerous activity.” He explained that “if they were throwing money at the Black and Gold celebration [the Party], that probably would be considered unsafe.” He answered in the negative when asked whether “if an officer saw somebody throwing T-shirts into a crowd where people were say shoulder to shoulder, that the officers wouldn’t have any duty to stop that.” He explained that he did not believe the throwing of the t-shirts was a risk to the customers outside, if in fact it was occurring, because of the parade atmosphere that was present.
• In the thirteen years that he has been employed by Harrah’s, he did not recall any event at which Harrah’s staff threw items into crowds on its premises.
• Other than Mrs. Zacher’s incident, he testified that there were no other reports of patron injury inside or outside on the date of the Party.
(iii) Karol Brandt, Harrah’s Sponsorship Specialist:[14]
• Her job was to work with vendors and sponsors planning events; her job duties did not include any input on providing security for such events.
• In February 2010, she collaborated with Crown to co-host the Party, which she characterized as an open-aired, music event.
• There was no written agreement between Harrah’s and Crown for the open-aired event. She explained that Harrah’s generates written contracts when it does “ticketed events or shows within the theatre or Masquerade [a closed-in facility], or if it’s a special event promotion in sales.” In contrast, this was an event that was open to the public.
• For the Party, which she labeled a “pep rally,” she ordered, on Harrah’s behalf, one thousand black souvenir towels. No one other than her had the authority to order any kind of souvenirs for this event that showed Harrah’s logo or promoted Harrah’s in any way. Hence, if someone else on Harrah’s property had ordered t-shirts, she testified that she would have known about it.
In* She arrived at the Party around 2:00 p.m. and stayed until all the souvenir towels were distributed. She testified that she did not leave the Party until about 7:00 p.m., when she went to another event at Ernst Cafe, which was across the street. From that event, she went back and forth to the Party.
• At no time while she was at the event did she observe anyone throwing t-shirts from the stage. Nor did she observe anyone wearing a white t-shirt of any kind that promoted either Har-rah’s or the Super Bowl victory or anything that looked like a promotion *140 al t-shirt. She denied seeing any type of advertising promoting a t-shirt throwing event.
• The Party was not the first time Har-rah’s distributed souvenirs. She cited as an example Hornets events at which Harrah’s distributed towels and hats. She testified that those souvenirs were distributed in the same manner as the towels — by hand in between the band’s breaks.
• She testified that Harrah’s had no employees acting as M.C. at the Party; rather, she testified that the M.C., whose name was “Robby,” was Crown’s employee. She noted that Harrah’s had no control over the show that Crown put on.
• As to the distribution of the souvenir towels, she testified that she and her co-employees handed out the towels from the stage area during the band’s breaks. She explained that the M.C. took the microphone in between the band to let the audience know that they were going to be handing out the towels. She instructed her staff to take them out of the box and hand them out. She testified that at no time did she or anyone else throw the towels.
• In response to the question of what instructions she gives to co-sponsors of events about throwing or not throwing things, like souvenirs, Ms. Brandt testified that “[i]n a Mardi Gras setting, most of these we don’t necessarily give them direction. I mean I have never really given them directions to say that they can’t but I’ve never seen them take out an air gun and throw anything like that off the stage.”
• She denied ever seeing an air gun, cannon, or projecting instrument being used on Harrah’s property to distribute souvenirs. She testified that at events during the Mardi Gras season she did not observe anyone shooting t-shirts out of a cannon or an air gun from the Canal Street staging area.
• While she was out in Fulton Square, she did not observe any scuffle to get a towel. Nor did she observe anyone being knocked down attempting to get a towel or for any other reason. Nor did she observe any horseplay, fighting, or commotions in the crowd created over a towel or a T-shirt. Nor did she see any t-shirt being thrown by anyone, including any band member. If she had observed behavior in Fulton Square that she considered created a dangerous situation, she would have called security. She never observed such behavior.
11⅞* She testified that no one approached the stage while she was there-which straddled the time of Mrs. Zacher’s alleged accident-seeking assistance or security because someone had been injured in the crowd.
(iv) Rudolph Leonard, Harrah’s EMT who treated Ms. Zacher.
• He testified that he was the EMT that responded to a call regarding a guest’s fall on Fulton Street on the day of the Party. He identified the EMT Medical Report that he prepared at 5:28 p.m. that day. His report states that on arrival he found the guest sitting by the statute and that the guest “stated another guest knocked her down.” He stated that the incident happened during the parade and that the guest, Mrs. Zacher, told him that she was knocked down by someone trying to grab a t-shirt that was shot from a float. He testified that Mrs. Zacher refused transportation to the hospital.
*141 • He denied going to the guest’s (Mrs. Zacher’s) hotel room to examine her.[15] He explained that if he had gone to the guest’s hotel room, it would have been noted in his report.
(v) Darryl Bartney, Jr., Harrah’s security officer and the report uniter.
• He testified that he was working as a security officer at the time of the Party and that he was assigned to be the report writer for the incident involving Mrs. Zacher.
• He was present at the same time as the EMT, Mr. Leonard. He identified the incident report he prepared that day, which stated: “[Mrs.] Zacher stated her and patron was reaching for shirt and the other patron stumbled backwards and knocked her over injuring her right shoulder and head.” The report further stated that he “observed the area [where the accident occurred] and did not notice any obstructions, protrusions or debris which could have contributed to her fall,” that he “observed area was adequately lit with artificial lighting,” and that the surveillance agent “was contacted and due to location there was no coverage.”
• He testified that Mrs. Zacher told him that the incident occurred on Fulton Street, not Fulton Square. He stated that she also told him that a t-shirt was being shot from a float into the crowd. He, however, acknowledged that he did not mention in his report the word “shot” or “float.”
• He explained that he went to check the area where the incident occurred — the physical area — to observe if there was any debris or anything in the area possibly that she could have landed on or tripped over. In response to the trial court’s question of where he went to conduct this inspection, he replied that he went to Fulton Street.
11S* As to surveillance, he testified that he determined that the area where the incident occurred was not under surveillance. Due to the location of the incident, he determined there was “no coverage.” By “coverage” he meant no surveillance footage was available.
Following the trial, the trial court rendered judgment in the Zachers’ favor. In its reasons for judgment, the trial court conducted a detailed duty-risk analysis.[16] Applying this court’s holding in Luckette v. Bart’s on the Lake, Ltd., 602 So.2d 108 (La.App. 4th Cir.1992),[17] the trial court *142 found that Harrah’s owed Mrs. Zacher, as a patron, a duty to protect her from the harm of “fellow guests” or third party patrons. In addressing whether Harrah’s breached that duty, the trial court focused solely on whether Harrah’s failed to provide adequate security. The trial court reasoned as follows:
During the trial there was testimony from both the Risk Manager and Director of Security and Transportation, that Harrah’s controlled the lot where this incident took place. Additionally, the Director of Security for Harrah’s, Mr. Dorsey, testified that on a normal business day there were a standard amount of security officers present; however, when there were events, such as this one, additional security officers were brought in, and occasionally Har-rah’s would supplement with Orleans Parish Sheriffs deputies. Not only did Mr. Dorsey testify that additional security was not brought in for this event because of how quickly the event came together, but also he stated that there was an outside area that was part of the officer’s |upatrol, but not specifically Fulton Square (where the event was taking place).
In Stewart v. Gibson Products Co. of Natchitoches Parish Louisiana, Inc., the Third Circuit found a business enterprise breached its duty to protect its patrons when they had an event that lacked advance preparation for the large crowd they expected to attend. 300 So.2d 870, 878-79 (La.App. 3d Cir.1974). Specifically, they found that had the defendant business enterprise done a safety investigation before hosting the event, they may have realized that it was likely the participants could be injured by “enthusiastic and careless crowd movements.” Id. Similarly, Harrah’s should have'expected a large turnout due to the enthusiasm of the Saints’ victory, as well as planning the event immediately before the parade. Harrah’s breached their duty to provide reasonable care to their patrons when they did not provide adequate security officers for the event in Fulton Square.
The trial court addressed the cause-in-fact and legal cause (whether the risk was within scope of protection) elements together, reasoning:
Plaintiff [Ms. Zacher] testified that she was injured when another patron reaching for the promotional item being distributed at the event knocked her back and caused her to fall on her left side. However, in somewhat conflicting testimony, Harrah’s Sponsorship Specialist claimed that she and another Har-rah’s employee were sitting on the stage handing out Saints towels. This court finds the testimony of Ms. Zacher credible. Whether the items being passed out were T-shirts or towels is of no matter, rather there was some method of distribution that caused another patron to reach over Ms. Zacher, lose his balance, and fall back on her. Harrah’s actions were certainly a cause-in-fact of her injuries and within the scope of protection afforded under the law.
The trial court allocated fault as follows: Harrah’s 10%;[18] Crown (a nonparty) 15%; and Mr. Doe (another non-party) 75%. On this issue, the trial court reasoned as follows:
*143 Although this trial court finds Har-rah’s negligent, it apportions Harrah’s responsibility for Plaintiffs’ [the Zach-ers’] damages at ten percent. The Risk Manager and the Director of Security and Transportation both testified that Harrah’s owns and controls the Fulton Square lot. In addition, Karol Brandt, Harrah’s Manager of 11BSponsorship and Entertainment, testified that part of her job responsibilities involve events on Fulton Square. In 2010, when she worked as Sponsorship Specialist, she helped plan the Black and Gold Super Bowl Party. She was at the event all day, and testified that she ordered the towels distributed at the party. However, she also testified that the event was a joint venture between Harrah’s and Crescent Crown. Crescent Crown was the sponsor of the event and she worked with them in planning the event. Crescent Crown managed the stage and the environment of the event. They allowed the events that led to Mrs. Zacher’s injuries. As the sponsor of the event, this court finds Crescent Crown fifteen percent responsible for the Plaintiffs’ [the Zachers’] damages. Finally, this court finds John Doe, who knocked down Mrs. Zacher and fled the scene, seventy-five percent liable for causing the Plaintiffs’ damages. It was reasonably foreseeable that failure to provide adequate security in the presence of such a large crowd could cause injury if a triggering event not properly managed occurred. That is what transpired here.
The trial court awarded Mrs. Zacher $150,000.00 in general damages and $16,976.36 in special damages, and Mr. Zacher $25,000.00 in loss of consortium damages. On May 29, 2013, the trial court denied the Zachers’ motion for new trial.[19] This appeal by Harrah’s followed.
DISCUSSION
Although Harrah’s raises four assignments of error, we find the dispositive issue is whether the trial court erred in finding Harrah’s liable. Answering this question in the affirmative, we find it unnecessary to reach the other issues raised by Harrah’s on appeal[20] or by the Zachers in their answer to Harrah’s appeal.[21]
lifiAs alleged in the original and amended petitions, the Zachers’ claims against *144 Harrah’s are based on three theories: (i) negligence, under La. C.C. art. 2315; (ii) strict liability, under La. C.C. art. 2317.1; and (iii) the casino’s status as a merchant, under La. R.S. 9:2800.6.[22] See Smith v. Casino New Orleans Casino, 12-0292, pp. 5-6 (La.App. 4 Cir. 10/3/12), 101 So.3d 507, 511.[23] Regardless of which theory applies, the plaintiffs had the burden of proving the five duty-risk elements — duty, breach, cause-in-fact, legal cause; and actual damages.[24] The trial 117court’s finding of liability on Harrah’s part was based on its finding that all five elements were satisfied.
Duty is a question of law and subject to a de novo standard of review. See Lovett v. Wal-Mart Stores, Inc., 29,-067, p. 4 (La.App. 2 Cir. 1/22/97), 687 So.2d 681, 684. Factual findings — including breach of duty, cause-in-fact, legal causation, and actual damages — are subject to the manifest error standard of review. Watters v. Department of Social Services, 08-0977, pp. 15-16 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1142 (citing Snearl v. Mercer, 99-1738, 99-1739, p. 11 (La.App. 1 Cir. 2/16/01), 780 So.2d 563, 574).
Normally, a trial court’s factual findings will not be disturbed on appeal unless the record establishes that a reasonable, factual basis does not exist and the finding is clearly wrong or manifestly erroneous. Daye v. General Motors Corp., 97-1653, pp. 5-6 (La.9/9/98), 720 So.2d 654, 658; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When factual findings are based on the credibility of a witness’s testimony, the appellate court must give great deference to the fact finder’s decision to credit a witness’s testimony. Rosell, supra. Although deference should be accorded to the fact finder, the reviewing court has a constitutional duty to review facts. La. Const, art. V, § 10 B; Daye, supra. The issue to be resolved by the reviewing court is not whether the fact finder is right or wrong, but whether the fact finder’s conclusion was a reasonable one. Syrie v. Schilhab, 96-1027, p. 4 *145 (La.5/20/97), 693 So.2d 1173, 1176 (citing Stobart v. State, Through Dep’t of Transp. and Development, 617 So.2d 880, 882 (La.1993)).
In conducting its duty-risk analysis, the Zachers contend that the trial court made two fact findings; namely: (i) that tangible items, whether t-shirts or towels, were thrown into a crowd of Harrah’s guests from a stage erected on its premises hsduring the Party it co-hosted; and (ii) that Harrah’s security personnel, at least two of whom were present in Fulton Square at the time of the negligent conduct, did nothing to stop or attempt to stop it. The Zachers contend that the record amply supports these two fact findings. They further contend that the throwing of the t-shirts and the security personnel’s failure to stop it were the legal causes of the accident.
In support of their contention that those were the legal causes of the accident, the Zachers cite two cases: Stewart, supra; and Skipper v. New Orleans Public Service, Inc., 338 So.2d 771, 773 (La.App. 4th Cir.1976). They note that in the Stewart case, the Third Circuit found that the dropping of the ping-pong balls, redeemable for merchandise discounts, was the legal cause of an accident that occurred when one customer knocked another customer down to the ground while scrambling for a ping-pong ball. Likewise, they note that in the Skipper case, this court found that a public transit bus driver’s failure to shut the bus door before attempting to collect fares from passengers was the legal cause of an accident that occurred when unruly passengers who boarded the bus behind the plaintiff knocked the plaintiff to the ground. Particularly, they quote Justice (then Judge) Lemmon’s concurring opinion in Skipper, in which he wrote:
The circumstance of the pushing and surging of the unruly crowd at the door of the bus, behind plaintiff who was standing there waiting for a transfer, involved the risk that the crowd would rush in and injure plaintiff if the door were left open and unattended. Existence of this Risk imposed a corresponding Duty on the part of the bus driver to take reasonable action to avoid the risk (as by closing the door when leaving it unattended). The failure to take reasonable action breached that duty and resulted in damages to plaintiff, and since there was an ‘ease of association’ between the risk and the duty, liability should be imposed. Hill v. Lundin & Associates, 260 La. 542, 256 So.2d 620 (1972).
Skipper, 338 So.2d at 773 (Lemmon, J., concurring).
li9By analogy, the Zachers contend that in this case, like the dropping of the ping-pong balls in Stewart, supra, and the driver’s failure to shut the bus door in Skipper, supra, the M.C.’s throwing of the t-shirts into the crowd and Harrah’s security personnel’s failure to stop the negligent conduct were the legal causes of the accident. They further contend that “[t]he risk that a patron scrambling to catch a t-shirt could accidently run into a fellow patron was foreseeable and within the scope of Har-rah’s duties.”
Harrah’s counters that the complained of condition was open and obvious and thus did not present an unreasonable risk of harm to Mrs. Zacher. See Mansoor v. Jazz Casino Co., LLC, 12-1546, pp. 1-2 (La.9/21/12), 98 So.3d 795, 795 (collecting cases and holding that “[a] landowner is not liable for an injury which results from a condition which should have been observed by the individual in the exercise of reasonable care, or which was as obvious to a visitor as it was to the landowner.”) *146 Harrah’s points out that Mrs. Zacher was aware that t-shirts were being thrown in Fulton Square before she entered the area. Moreover, she watched as two t-shirts were thrown into the crowd during a ten to fifteen minute period before the third throw that led to her being knocked down. Harrah’s thus contends that she had ample time to move away from the open and obvious condition.
Regardless, Harrah’s contends that the unknown man’s actions were the sole legal cause of Mrs. Zacher’s injury. It contends that it was not foreseeable that the unknown man would knock Mrs. Zacher down while scrambling to catch a t-shirt. In support of its contention, Harrah’s cites Mosley v. Temple Baptist Church Of Ruston, Louisiana, Inc., 40,546 (La.App. 2 Cir. 1/25/06), 920 So.2d 355. In the Mosley case, the plaintiff was injured when she was knocked down by a teenager who was running at a festival on the church’s property. The plaintiff sued the |20church claiming it was negligent in failing to provide adequate security for the event. Rejecting this contention and affirming the trial court’s decision granting the church’s motion for summary judgment, the Second Circuit reasoned that “[t]he undisputed facts show that this accident was a sudden and precipitous event that the church would have been hard pressed to prevent, regardless of the number of security guards that were employed.” Mosley, 40,546 at p. 6, 920 So.2d at 358 (citing Fleming v. Hilton Hotels Corp., 99-1996 (La.App. 4 Cir. 7/12/00), 774 So.2d 174). The Second Circuit further found that the church fulfilled its duty to provide adequate security, noting that “[t]he church showed that they fulfilled their duty by utilizing at least five sheriffs deputies for security as well as having 150 volunteers [working at the festival.]” Mosley, 40,546 at p. 7, 920 So.2d at 359.
As in the Mosley case, Harrah’s contends that it provided a safe environment for its patrons. It emphasizes that during the Party it had security personnel roving its property, including Fulton Square. It also cites the undisputed testimony of Mr. Dorsey and Mr. Parr that, with the exception of Mrs. Zacher, there was no other incidents of injury or accident on Harrah’s property that day. Given these circumstances, it contends the trial court erred in finding it liable.
In finding Harrah’s liable, the trial court focused on Harrah’s failure to plan for an expected large crowd due to the Saints’ victory by increasing its security. On that basis, the trial court found that Harrah’s breached its duty to provide adequate security. Contrary to the Zachers’ contention, the trial court did not find Harrah’s breached its duty because its security personnel failed to stop the M.C. from throwing the t-shirts. Despite its finding that Mrs. Zacher’s testimony was credible, the trial court, in its reasons for judgment, made no finding that anyone was throwing t-shirts. Indeed, the trial court expressly declined to determine whether l^the items being distributed that precipitated Mrs. Zacher’s injury were towels or t-shirts, stating:
Whether the items being passed out were T-shirts or towels is of no matter, rather there was some method of distribution that caused another patron to reach over Ms. Zacher, lose his balance, and fall back on her. Harrah’s actions were certainly a cause-in-fact of her injuries and within the scope of protection afforded under the law.
Disagreeing with the trial court, we find the distinction between whether the items being distributed that precipitated Mrs. Zacher’s accident were Harrah’s souvenir black towels or the unidentified white t-shirts is critical to an analysis of *147 Harrah’s liability. Without resolving that critical factual issue, the Zachers’ evidence shows only the possibility of a causative accident for which Harrah’s is liable. See Zion v. Stockfieth, 616 So.2d 1378, 1380 (La.App. 5th Cir.1993) (noting that proof to substantiate a claim for damages must be clear and definite and not subject to conjecture); Prim v. City of Shreveport, 297 So.2d 421, 422 (La.1974) (noting that a plaintiff’s case must fail if the evidence shows only a possibility of a causative accident or leaves it to speculation or conjecture).
The evidence presented regarding the souvenir black towels was undisputed. Ms. Brandt testified that Harrah’s purchased one thousand towels for the event. Harrah’s introduced color photographs of one of the towels and of Ms. Brandt and her co-worker on the steps of the stage, each holding a towel. Ms. Brandt testified that she and her co-workers distributed the towels by hand from the stage during the band’s breaks. No evidence was presented that the towels were thrown or that the distribution of the towels created any commotion or disturbance in the crowd.
In contrast, the only evidence regarding the white t-shirts was the Zachers’ somewhat contradictory testimony. The Zach-ers both testified that the M.C. threw t-shirts into the crowd standing inside Fulton Square. They both testified that the t-_Jshirt22 throwing lasted for about fifteen minutes before an unidentified gentleman knocked Mrs. Zacher to the ground while attempting to catch a t-shirt. The Zach-ers’ testimony was inconsistent as to whether the t-shirt throwing had begun before they entered Fulton Square — Mrs. Zacher testified it did; Mr. Zacher testified it did not. The Zachers’ testimony also was inconsistent with the allegations in their original and amended petition, which averred that the t-shirts were shotout of an air gun or a cannon and that there was a “stampede” of patrons. At trial, the Zachers acknowledged that there was no air gun or cannon and that the t-shirts were thrown from the stage. They also acknowledged that there was no stampede of patrons; rather, there was only one patron who allegedly “trampled” Mrs. Zacher to catch a t-shirt.[25]
The Zachers could not describe what the t-shirts looked like — other than that they were white and rolled up like footballs — or what, if anything, the t-shirts had written on them. The Zachers did not see anyone, other than the people on stage, with the t-shirts. The Zachers failed to call any witnesses to confirm that the incident happened as they described, although they testified that their two other family members witnessed the t-shirt throwing.[26]
At best, the Zachers’ testimony regarding the t-shirts established that the M.C. threw three to five t-shirts into the crowd *148 in a ten to fifteen minute interval | ^before the accident. No evidence was presented that the M.C.’s acts created a commotion or disturbance in the crowd. It is undisputed that there were no other reports of injury, accident, or arrest on Harrah’s property that day. The question presented thus becomes whether Harrah’s breached any duty it owed Mrs. Zacher based on the M.C., a Crown employee, throwing a handful of t-shirts.
Harrah’s points out that “there is no independent or corroborating evidence that any t-shirts were thrown by anyone;” conversely, it points out that “there is ample physical evidence and documentary evidence that Harrah’s handed out small black hand towels.” Harrah’s also points out that the evidence established that it previously handed out souvenir towels on its property without incident. In support, it cites Ms. Brandt’s testimony that Har-rah’s handed out towels at previous public events without incident. Moreover, Mr. Parr corroborated Ms. Brandt’s testimony that there was no previous report — going back to 2006 when Mr. Parr became Har-rah’s Risk Manager — made by anyone injured on Harrah’s property as a result of items being thrown from a stage. Har-rah’s thus contends that there is no evidence to establish that it could have foreseen that a patron would be knocked down to the ground by another patron scrambling to catch a t-shirt.
Sidestepping the issue regarding the t-shirts, the trial court in its reasons for judgment focused instead on Harrah’s failure to plan for an expected large crowd due to the Saints’ victory by increasing its security for the event. In so doing, the trial court relied — albeit without citing it— on the principle enunciated in the Restatement (Second) of Torts § 344, cmt. f (1965), regarding a business owner’s duty to police its premises; this provision states:
124Í- Duty to police premises. Since the possessor is not an insurer of the visitor’s safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor, even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection.
The two cases cited by the trial court in its reasons for judgment — Luclcette and Stewart — illustrate the application of this principle in two different settings: (i) protection against third party criminal conduct,[27] *149 and (ii) crowd control for extraordinary promotional events.[28] The facts of this case, however, fall within neither of those settings. The trial court’s reliance on those cases, and the duty to police principle on which those cases are based, was thus misplaced.
As we noted in Luckette, “[m]ost of the law on the duty of business enterprises [to provide security] applies specifically to protecting patrons from jgBassault by third parties, employees, or fellow patrons.” 602 So.2d at 111.[29] It is undisputed that this case does not involve third party criminal conduct; rather, this case involves an accident. This court addressed the application of the duty to police in the context presented here — an accident — in Fleming, supra.
The plaintiff in the Fleming case alleged that the Hilton hotel and its security director were negligent in failing to provide adequate security to prevent the hotel escalator from becoming overcrowded and in failing to provide adequate security to prevent pushing on the escalator. Rejecting those contentions, we reasoned that “Louisiana jurisprudence has clearly established that a business owner’s duty to provide security focuses on the prevention of crime, not the prevention of accidents.” Fleming, 99-1996 at p. 4, 774 So.2d at 177 (citing Dye v. Schwegmann Brothers Giant Supermarkets, Inc., 627 So.2d 688 (La.App. 4th Cir.1993); Posecai v. Wal-Mart Stores, Inc., 99-1222 (La.11/30/99), 752 So.2d 762; Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364, 1371 (La.1984); Carpenter v. Johnson, 95-0431 (La.App. 1 Cir. 12/15/95), 664 So.2d 1354). Noting that all of the above cited cases involved incidents of criminal activity — as opposed to accidents — we reasoned that “it would take a quantum leap to find that a business is required to provide security to prevent an unforeseeable accident from occurring. An accident by its very nature is unpredictable and unforeseeable.” Fleming, 99-1996 at pp. 5-6, 774 So.2d at 178. We noted that the fact Hilton had a security 1guard stationed at the top of its escalator at the time of the accident was relevant only to establish that Hilton “presumptively provided security to prevent or monitor criminal activity in the hotel.” Fleming, 99-1996 at p. 6, 774 So.2d at 178. Accordingly, we held that Hilton had no duty to provide security to prevent accidents and could not be found negligent for failing to do so.
To the extent the trial court’s finding of liability is based on Harrah’s duty to provide adequate security, we find the trial court erred, legally and factually. Legally, as this court held in Fleming, there is no duty to provide security to prevent an *150 accident. Although, as in Fleming, Har-rah’s had security present, Harrah’s presumptively provided security to prevent or monitor criminal activity on its casino and hotel premises, not to prevent an accident.[30]
Factually, there is no evidence that Har-rah’s security for the Party was inadequate. Contrary to the trial court’s statement in its reasons for judgment, Harrah’s did supplement its security personnel for the day of the Party. As noted, Harrah’s supplemented its security personnel that day because of the city-wide events that were occurring given the Super Bowl victory. Mr. Dorsey, Harrah’s ^Director of Security, testified that for parade days the only extra measure Harrah’s takes is to increase the number of security officers; Harrah’s did so on the date of the Party; there was extra security staff present and patrolling Harrah’s premises. Also, again contrary to the trial court’s suggestion, the security personnel’s patrol of Harrah’s premises included Fulton Square, where the Party was held. The only aspect of security that did not cover Fulton Square was the surveillance video monitor. The surveillance covered parts of Fulton Street, but not Fulton Square. The trial court’s finding that Harrah’s failed to provide adequate security is thus not supported by the record.
As noted, the other case the trial court cited was Stewart, supra. In that case, the Third Circuit cited the Restatement (Second) of Torts § 344 in support of its finding that a store owner was liable for its failure to provide adequate crowd control for an extraordinary promotional event — a ping-pong ball drop.[31] In addressing the store owner’s duty, the Third Circuit stated:
Relevant to this inquiry is an examination of the conduct the crowd is expected to exhibit once assembled and a distinction should be drawn between a crowd of Spectators ... and a crowd of Participants as is here involved. There is, for example, no negligence Per se in sponsoring a football game to be attended by 80,000 spectators; howevér, the same may not be said for a promotion where ping-pong balls redeemable for merchandise are dropped on the playing field at half-time with an invitation to the assembled crowd to try to ‘capture’ one or more balls.
Alternative, equally effective, means of advertising were available to defen *151 dant-merchants, which involved less risk' of harm to their patrons. We find defendants’ conduct, viewed in its most favorable light, to have been of marginal social utility. No investigation was conducted by defendants to determine the safety of 128a drop nor was advance preparation made for the large crowd defendants expected to attend. Had a safety investigation been made, defendants may well have discovered that not only was it likely that participants in the drop could be injured by enthusiastic and careless crowd movement, but also that injury received in an airplane drop had been the subject of litigation in another state. See Hicks v. M.H.A., Inc., 107 Ga.App. 290, 129 S.E.2d 817 (1963).[32]
Stewart, 300 So.2d at 878-79.
If Harrah’s had planned and conducted, a promotional t-shirt throwing event at the Party, the analogy to Stewart might be appropriate. Under that scenario, Har-rah’s arguably could be liable for the foreseeable risk that a patron would get harmed by other patrons scrambling in the crowd for a Harrah’s t-shirt. See Abato v. County of Nassau, 65 A.D.3d 1268, 1269, 886 N.Y.S.2d 218, 219 (N.Y.A.D. 2 Dept. 2009).[33] Harrah’s, however, did not plan to conduct any type of participant, promotional event. Harrah’s never advertised the Party as a “Mardi Gras” like participant event' at which items would be thrown into the crowd. The Party, as the Zachers acknowledge, was advertised as a pure spectator event. The throwing of t-shirts was not a part of the planned event. The only items Harrah’s planned to provide, and provided, were the small black towels that its staff handed out from the stage. No one testified that these towels were thrown into the crowd. Nor is laathere any evidence that Harrah’s was aware of the M.C.’s act of throwing t-shirts. The trial court’s reliance on the Stewart case thus was misplaced. We find it would be unreasonable to conclude that Harrah’s had a duty to police against the M.C.’s unexpected act of throwing t-shirts.
The Zachers next contend that Harrah’s was vicariously liable for the M.C.’s act of throwing the t-shirts. The Zachers’ vicarious liability argument hinges on the reference by both the trial court and Ms. Brandt to the Party as a “joint venture” between Harrah’s and Crown. The Zachers unsuccessfully advanced this same argument in their motion for new trial. Rejecting this argument, the trial court pointed out that by using that term joint venture it meant that Harrah’s and Crown combined their efforts to put on the *152 Party; stated otherwise, it was not using the term to refer to a legal relationship. Indeed, the trial court noted that its use of the term joint venture was simply a poor choice of words. The trial court further noted that the evidence presented established that each of them provided something for the Party — Harrah’s furnished the venue; Crown furnished the management and the entertainment. The trial court added that the reason it allocated slightly more fault to Crown than to Har-rah’s was because Crown had a little bit more of the management of the event. The trial court thus found that there was no joint venture.
The Zachers contend that the trial court erred in failing to find that the repeated testimony of Harrah’s corporate representative, Ms. Brandt, that there was a joint venture constituted an admission or stipulation. Harrah’s counters that Ms. Brandt was an employee and head of its entertainment and marketing divisions of its casino; she was not an attorney. It contends that she did not intend any legal significance by her use of the term. It points out that this was a marketing event, lanthat there were no profits to be shared, and that there were no losses to distribute. In sum, Har-rah’s contends that Ms. Brandt’s comment, when viewed in context, was insufficient to establish a joint venture. We agree.
It is well settled that while what constitutes a joint venture is a question of law, the existence or nonexistence of a joint venture is a question of fact. Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (1972). “Joint ventur-ers generally have (1) a common interest in the objects or purposes of the enterprise and (2) an equal right, either express or implied, to direct and control the conduct of one another in their venture.” Frank L. Maraist and Thomas C. Galligan, LOUISIANA TORT LAW (1996). “Normally, the joint venture must be one for pecuniary gain.” Id. The difference between a joint venture and a partnership is that a joint venture generally is formed only for a particular project (venture); whereas, a partnership is formed as an ongoing entity for multiple purposes. Id.
Applying these principles, we find no manifest error in the trial court’s finding that the relationship between Harrah’s and Crown does not satisfy the requirements of a joint venture. Ms. Brandt’s reference to the relationship between Harrah’s and Crown as a joint venture was not meant in a legal sense; rather, as Harrah’s contends and the trial court found, it was meant in a colloquial sense of them working together. The event was in the nature of a “pep rally.” There was no pecuniary gain to be shared. Ms. Brandt testified that Harrah’s had no control over the show Crown presented. Accordingly, the trial court correctly rejected the Zachers’ argument that there was a joint venture between Harrah’s and Crown; and it correctly found that Harrah’s was not vicariously liable for the M.C.’s acts.
The Zachers’ final argument is that because Harrah’s admitted that it had “sole operational control over Fulton Square” at all times during the Party, it was ^Irresponsible for the M.C.’s acts in throwing the t-shirts. The term “operational control” is generally employed in the independent contractor setting,[34] which is not present here. Regardless, there is no evi *153 dence in the record that Harrah’s admitted “operational” control. Harrah’s admitted only that it had control over the venue where the Party was held. Simply put, it admitted its status as owner of the venue. As owner, Harrah’s was subject to liability only for its own negligence and for defects or hazardous conditions on its property that it knew or should have known about. See La. C.C. art. 2815, La. C.C. art. 2817.1, and La. R.S. 9:2800.6. As previously discussed, the record does not support a finding of liability on any of those grounds.

DECREE

For the foregoing reasons, the judgment of the trial court is reversed.
REVERSED.

. Mrs. Zaeher was seventy years old at the time of her injury to her left shoulder. She was treated for an injury by a physician for approximately ten months.

. For ease of reference, we refer in this opinion to the various Harrah's entities collectively as "Harrah’s."

. Two colored photographs depicting the towels were introduced at trial, which were as follows: (i) a photograph of Karol Brandt, Harrah’s Sponsorship Specialist, and her coworker standing on the steps of the stage, each holding one of the towels; and (ii) a photograph of one of the black towels.

. At the time of trial, Fulton Square no longer existed; Manning’s Restaurant has been built on that space. In contrast to Fulton Square, Fulton Street is a pedestrian mall that runs from Poydras Street to Lafayette Street.

. Although the Zachers testified that the sign said there would be "free beer” at the Party, the Zachers acknowledged that they saw no *135 one distributing free beer at the Party. Ms. Brandt testified that no free beer was distributed and that it would have been illegal for them to distribute free beer at the Party.

. The only other evidence regarding the size of the crowd was Ms. Brandt’s testimony that there were about 200 people present at the Party.

. Nonetheless, Mr. Zacher acknowledged that he told the security officer that Mrs. Zacher was knocked down “not in the courtyard,” but "by the stands.”

. At trial, the trial court noted that "the air gun doesn’t seem to have been there.” The Zachers' counsel acknowledges this was simply a misstatement in the petition; however, the petition was never amended to correct it. At trial, the Zachers acknowledged that there was no air gun or cannon used to throw the t-shirts in the crowd; rather, they testified that the M.C. threw the t-shirts into (he crowd by *137 hand. Mrs. Zacher also denied telling Dr. Whitehead that the t-shirts were ejected from an air gun or canon; however, Dr. Whitehead’s deposition testimony and medical records document that she gave a history to him of t-shirts being shot out of a "canon.” The trial court noted that this was a credibility issue.

. They also named an "Unknown Radio Station.” Given there was no evidence presented at trial regarding the unknown radio station, we do not address it in this opinion.

. The amended petition further averred that Harrah’s was vicariously liable for the negligence of the individuals who were conducting the t-shirt promotion for the following reasons:
• Failing to conduct the event at issue, including the t-shirt promotion, in a safe manner;
• Failing to hand-out the t-shirts in lieu of distributing them randomly into a mass of people;
• Failing to warn your petitioner of the potential dangers associated with ejecting the t-shirts into a mass of people; [and]
• Failing to conduct the t-shirt promotion in a more open, less congested environment.
The amended petition still further averred that Harrah's was liable for its own negligence for the following reasons:
• Failing to properly supervise the individuals who were ejecting the t-shirts into the crow[d]s; [and]
• Failing to properly train the individuals who were ejecting the t-shirts into the crowd relative to a safer means of distributing the t-shirts.

. The trial court noted that the reason for doing so was based on the issue of foreseeability. It explained that the issue was whether it was foreseeable that her injuries would be the result of the activity allowed.

. The Zachers’ testimony is summarized elsewhere in this opinion.

. The security covered the entire inside of the casino building,' the outside of the casino building itself, the hotel, the two parking garages, Fulton Street pedestrian mall, and Fulton Square. Security's job was to provide a safe environment for the customers. The fixed positions where security officers were stationed were primarily inside the casino building. Outside the building the security officers provided essentially a “roving patrol.’’ Their roving patrols included Fulton Square. The officers outside also had bike patrols. They were not stationed in a particular place. On the day of the Party, Harrah's had two Orleans Parish deputies, one at the casino and one at the hotel. These officers, like the security officers, roved the premises.

. Ms. Brandt’s job title at the time of the Party was Harrah’s Sponsorship Specialist; her title subsequently was changed to include Entertainment Manager.

. Both Mr. and Mrs. Zacher testified that because Mrs. Zacher did not want to be examined in public, the EMT accompanied them to their hotel room.

. The duty-risk analysis requires the plaintiff to establish the following five elements to prevail: (i) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (ii) the defendant owed a duty to the plaintiff; (iii) a breach of the duty; (iv) the defendant’s substandard conduct was the legal cause of the plaintiff’s injuries; and (v) damages. Perkins v. Entergy Corp., 00-1372, 00-1387, 00-1440, p. 7 (La.3/23/01), 782 So.2d 606, 611; see also Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217, p. 6 (La.4/3/02), 816 So.2d 270, 275-76. The plaintiff must prove every element by a preponderance of the evidence. Riley v. Salley, 03-1601, p. 2 (La.App. 4 Cir. 4/21/04), 874 So.2d 874, 876.

.In Luckette v. Bart's on the Lake, Ltd., 602 So.2d 108 (La.App. 4th Cir.1992), this court reviewed the jurisprudence on the duty of a business enterprise to protect patrons from assault. Quoting Anderson v. Clements, 284 So.2d 341 (La.App. 4th Cir.1973), we noted that while the proprietor of a public place is not the guarantor of a patron's safety, it owes the duty to exercise reasonable care to protect the patron from harm at the hands of a fellow guest or an employee and to protect the patron from insult, annoyance, and danger. This court further noted that once a business *142 voluntarily assumes a duty to protect, the duty has to be performed with due care.

. We note, as the defendant Jazz Casino Company, L.L.C. points out, the trial court rendered judgment against the wrong entity- — ■ Harrah’s New Orleans Management Company, d/b/a Harrah’s New Orleans. The correct legal entity is Jazz Casino Company, L.L.C.

. The Zachers’ motion for new trial was based on their claim that Harrah’s and Crown were a joint enterprise and thus jointly 25% at fault.

. Harrah’s asserts the following four assignments of error:
1. The Trial Court committed manifest error or was clearly wrong when it rendered judgment against Harrah’s New Orleans Management Company, d/b/a Harrah's New Orleans. The appropriately named defendant is JAZZ CASINO COMPANY, L.L.C.
2. The Trial Court committed manifest error or was clearly wrong when it rendered its judgment in favor of plaintiffs in finding that "Harrah’s did owe Ms. Zacher, as a patron, a duty to protect her from the harm of ’fellow guest’ or third party patrons” and finding that Harrah’s was ten percent (10%) liable for plaintiffs’ damages.
3. The Trial Court committed manifest error or was clearly wrong in its failure to assess Beverly Zacher and David Zacher with comparative negligence.
4. The Trial Court committed manifest error or was clearly wrong when it rendered judgment in favor of plaintiff Beverly Zacher in the ... sum of $150,000.00, plus medicals of $16,976.36, as well as judgment in favor of David Zacher for loss of consortium in the amount of $25,000.00.

.In their answer, the Zachers seek an increase in amount of fault allocated to Har-rah's. They contend that the trial court failed to properly apply the factors set forth in Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985).

. In Crowther v. Kmart Corp., 568 So.2d 669 (La.App. 4th Cir.1990), this court applied the merchant statute, La. R.S. 9:2800.6, to find Kmart liable to a customer injured when a "blue light special” was announced in the store. This court reasoned that Kmart's "blue light special” was designed to attract as many customers as possible in a short period of time and in a limited space and that Kmart attracted "thirty to forty enthusiastic” people uncontrolled by store personnel. Based on Kmart's failure to use reasonable care in controlling the crowd, this court found Kmart liable.

. The Zachers contend that their claims are solely negligence claims under La. C.C. art. 2315 and 2316. In support, they argue, in their appellees' brief, that the accident occurred because Harrah's, its employees, and third persons whose conduct Harrah's is liable for, committed numerous acts and omissions. They contend that because Mrs. Zacher was not injured because of a defect or .other "condition” on Harrah’s premises, neither La. R.S. 9:2800.6 nor La. C.C. art. 2317.1 apply. However, as Harrah’s counters, the Zachers’ assert in their petitions claims that are broader than negligence; as noted, they aver that Harrah's was liable for "creating a dangerous and hazardous condition on its premises; and allowing a dangerous and hazardous conditions/event to occur on its property.”

. See McCloud v. Housing Authority of New Orleans, 08-0094, p. 3 (La.App. 4 Cir. 6/11/08), 987 So.2d 360, 362-63 (holding that "[n]egligence and strict liability claims are both analyzed under the duty risk analysis”); Broussard v. Retail Investors of Tex., Ltd., 13-414, p. 3 (La.App. 3 Cir. 10/9/13), 123 So.3d 912, 915 (holding that a plaintiff asserting a claim against a merchant has to prove not only the element of merchant liability under La. R.S. 9:2800.6, which include proving that "[t]he merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence,” but also the duty-risk elements).

. Another inconsistency between the petitions and the evidence presented at trial was regarding where the accident occurred. In the original petition, the Zachers averred that the accident occurred at 8 Canal Street. In the amended petition, they averred that it occurred on "Fulton Street adjacent to Har-rah’s ... casino.” At trial, they testified that it occurred in Fulton Square. According to the EMT and security officer who was the report writer, they were informed that the accident occurred on Fulton Street. See La. C.C.P. art. 1154.

. Mrs. Zacher's testimony regarding the method distribution of the t-shirts also was inconsistent with the medical history she provided to Dr. Whitehead, who stated in his deposition that she gave a history of t-shirts being shot from a cannon. According to Har-rah’s EMT, Mr. Leonard, and Harrah’s security officer and the report writer, Mr. Bartney, Mrs. Zacher told them the t-shirts were thrown from a float.

. In his concurrence in Posecai v. Wal-Mart Stores, Inc., 99-1222, p. 1 (La. 11/30/99), 752 So.2d 762, 769 (Lemmon, J., concurring), he noted that the Restatement (Second) of Torts § 344 (1965) provides the standard to apply in determining liability for third party criminal conduct; he stated:
A merchant has the duty to exercise reasonable care to discover that criminal acts by third persons are likely to occur on the merchant's premises and to take adequate steps to protect customers when and where such conduct is reasonably foreseeable. See 2 Restatement (Second) of Torts § 344 (1965). If the place and character of the merchant's business, considered with past experience, is such that the merchant should reasonably anticipate criminal con *149 duct by third persons, generally or at some particular time or place on the premises, the merchant should take appropriate precautions and provide reasonable security measures and, if necessary, a reasonably sufficient number of security persons to afford reasonable protection. Id. at cmt. f

. In Stewart, supra, the Third Circuit cited the Restatement (Second) of Torts § 344 in support of its finding of liability for failure to provide adequate crowd control for an extraordinary promotional event.

. Although the facts in the Luckette case did not fit the normal pattern, we found it appropriate to extend the duty to the unique circumstances presented. In that case, the defendant, Hotard Coaches, Inc., was hired to transport intoxicated persons for a bachelor’s party. We reasoned that "[b]ecause Hotard knowingly undertook the transportation of intoxicated persons, it undertook a duty to protect third parties from risks occurring on or connected with the transportation, a 'duty to protect against the predictable risks of assaults.’ ” Luckette, 602 So.2d at 112 (quoting Smith v. Walgreens Louisiana Co., 542 So.2d 766, 767 (La.App. 4th Cir. 1989)).

. We further note that the principle enunciated in Harris, regarding a business owner assuming a duty to provide security, was clarified by the Louisiana Supreme Court in Posecai, 99-1222 at p. 10, 752 So.2d at 769, n. 7; the Supreme Court reasoned:
We reject the court of appeals' [sic] finding that Sam’s assumed a duty to protect its patrons from crime when it hired a security officer to guard its cash office. This finding relies' on an erroneous interpretation of our decision in Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La. 1984). Pizza Hut does not stand for the proposition that a business assumes the duty to protect its customers from the criminal acts of third persons merely because it undertakes some security measures. Rather, Pizza Hut was an ordinary negligence case, holding that a security guard employed by a business must exercise reasonable care for the safety of the business’ patrons and breaches that duty when his actions cause an escalation in the risk of harm. In Pizza Hut, the restaurant’s security guard was negligent because he heightened the risk of harm to Pizza Hut's customers by provoking gunfire from armed robbers who had entered the restaurant.

. The event in Stewart was planned as a participant event, as opposed to a spectator event. In Stewart, the defendant conducted a ping-pong ball drop promotion. The plaintiff was injured as a result of one of the defendant's customers knocking her to the ground while scrambling for the ping-pong balls.

. Hicks v. M.H.A. Inc., 107 Ga.App. 290, 129 S.E.2d 817 (1963), was a suit against a shopping center owner for injuries sustained by a patron knocked down by a crowd scrambling to get paper plates, which were redeemable for merchandise, that were dropped from an airplane onto a parking lot. The Georgia appellate court found that the foreseeability of the crowd’s actions in competing for the plates dropped from the airplane was a jury question.

. In Abato v. County of Nassau, 65 A.D.3d 1268, 886 N.Y.S.2d 218 (N.Y.A.D. 2 Dept. 2009), the plaintiff alleged that she was injured while attending a hockey game held in the Nassau Veterans Memorial Coliseum. The injury occurred when she was knocked down by other spectators attempting to catch a souvenir t-shirt that was tossed into the stands. Finding the defendants failed to establish the acts were unforeseeable, the court reasoned that "[t]he commotion that followed the launch of the T-shirt was not the unprompted act of another spectator ...; it was the natural response of those spectators to the action of the appellants.” Abato, 65 A.D.3d at 1268-69, 886 N.Y.S.2d 218. The court further reasoned that “since the appellants created the circumstánces that allegedly led to the plaintiff's injuries, their lack of notice is not a defense.” Abato, 65 A.D.3d at 1269, 886 N.Y.S.2d 218.

. See Grammer v. Patterson Services, Inc., 860 F.2d 639, 644 (5th Cir.1988) (noting that the term "operational control” as employed by Louisiana courts is traceable to the Restatement (Second) of Torts § 414, cmt. a (1965), which provides that "[i]f the employer of an independent contractor retains control over the operative detail of doing any part of the work,” the employer can be liable, for the independent contractor's offenses.)