MADELEINE M. LANDRIEU, Judge.
Lin this consolidated appeal, defendant/appellant, SMG, Inc., appeals the trial court judgment, rendered on July 11, 2014 and amended on September 12, 2014, in favor of plaintiffs/appellees, Jocelyn Burch, Kizzy Stamps and Keela‘James, for injuries sustained as a result of an elevator accident at the Louisiana Superdome in New Orleans on December 16, 2007.[1] Plaintiffs/appellees have answered the appeal, requesting increased awards of damages.
The accident that is the basis of this lawsuit occurred following a New Orleans Saints football game at the Louisiana Su-perdome. According to the testimony of the plaintiffs, the three of them and as many as fifteen other people boarded elevator # 3 on the sixth floor of the Super-dome after the game ended. The door closed and the elevator descended to the fifth floor. When the door opened, those waiting for the elevator on the fifth floor did not board because the elevator was already full. The elevator door had only closed partially when the elevator began descending again. Suddenly, the elevator dropped to the bottom floor with Lgreat force. The elevator shook and the ceiling of the elevator along with lights, wires and insulation fell down on the occupants. By the time the elevator landed on the ground floor, the door to the elevator had completely closed.
According to plaintiffs, immediately after the impact, the occupants of the elevator were screaming and panicking. Several, people on board used their cell phones to summon help. Although the door to the elevator was closed, the occupants could see light from a gap above the door, indicating that the elevator had not stopped at floor level. Rescuers arrived within approximately ten minutes of the accident, and attempted to lift the elevator to floor level to get the occupants out. When they lifted the elevator approximately three to four feet, the elevator dropped again. After a failed attempt to raise the elevator even with a floor, the rescuers lifted the elevator just enough to pull the occupants out through a gap above the elevator door.
The three plaintiffs were brought by ambulance to area hospitals, and treated *657 for injuries which will be discussed later in this opinion. Each of the plaintiffs timely filed suit against various defendants, including SMG, for damages sustained as a result of the December 16, 2007 elevator accident. In these lawsuits, plaintiffs alleged that the accident was caused by the negligence of SMG, a company that manages the daily operations of the Super-dome, and other now-dismissed defendants. Plaintiffs alleged that SMG was negligent and/or strictly liable for failing to properly perform routine maintenance, inspections and repairs on the elevator; • failing to warn patrons of the unsafe condition of the elevator; failing to ^supervise the pedestrian flow and usage of the elevator to prevent overloading; failing to shut down the elevator when it knew or should have known the elevator was not operating safely; and taking actions that resulted in the elevator dropping a second time after the initial impact.
Following a bench trial,, the trial court rendered judgment on July 11, 2014 in favor of plaintiffs and against the State of Louisiana through the Board of Commissioners of the Louisiana Stadium and Exposition District and SMG, Inc. The trial court awarded damages to plaintiffs, with interest from date of judicial demand, in the following amounts:
Jocelyn Búrch: $350,000.00 for 'past, present and future pain and suffering; $149,527.00 for past ' lost wages; $76,047.15 for past medical expenses; $103,181.80 for future medical expenses; $193,872.00 for future lost wages; ‘ and costs of $9,469.57.
Keela James: $200,000.00 for past, present and future pain and suffering; $84,586.47 for , past lost wages; $15,381.26 for past medical expenses; and costs of $4,950.82. ,s
, Kizzy Stamps: $400,000.00 for past, present and future pain and suffering; $113,100.00 . for past lost wages; $36,844.00 .for past medical expenses; $80,869.14 for future medical expenses; $139,286.15 for future lost wages; and costs of $5,076.32.
Plaintiffs filed a motion for new trial and/or, in the alternative, for judgment notwithstanding the verdict and/or, in the further alternative, to amend the judgment to conform to the evidence. In this motion, plaintiffs asked that the judgment be amended to cast SMG in judgment as the sole' tortfeasor in this action, instead of easting-both the State and* SMG in judgment. Plaintiffs argued that the evidence at trial established that SMG had custody, garde and control of the Superdome facility, including the elevator systems, and that SMG is solely Irresponsible for plaintiffs’ damages due to its negligence in failing to properly control the operations of the elevators and control the number of persons accessing the elevators after events. Plaintiffs noted that a finding that SMG is solely responsible for,their damages is significant because unlike the State, SMG does not enjoy the, protection set forth in La. R.S. 13:5106 that limits damages in actions against the State or any of its political subdivisions to $500,000.00.
On September 12, 2014, the trial court amended the judgment, noting that there was no opposition to the motion for new trial or alternative motions. In the amended judgtnent, the trial court found SMG 100% liable to plaintiffs, and awarded damages in the same amount listed in the July 11, 2014 judgment. The amended judgment dismissed the defendant, State of Louisiana through the Board of Commissioners of the Louisiana Stadium and Exposition District, and adopted by reference the reasons for judgment issued on July 11,2014.
In its .reasons for judgment, the trial court, found that although SMG was cited *658 for inadequate maintenance procedures, the elevator crash was not precipitated by a defect or lack of maintenance. Rather, the trial court found that the accident was the result of the elevator being loaded beyond its capacity. The trial court further found that SMG was negligent in its failure -to properly control the operations of its elevators and control -the number of persons accessing the elevators after events, and that its negligence was a cause-in-fact of plaintiffs’ injuries. The trial court found that plaintiffs had- no comparative fault for thej^o ver crowding of the elevator. SMG has appealed the trial court judgment, and plaintiffs have answered the appeal. , ■ :
LIABILITY
SMG argues that the trial court erred in finding it liable for the elevator accident asserting that plaintiffs failed to carry their burden of proving each element of the duty-risk analysis by a preponderance of the evidence. Specifically, SMG argues that plaintiffs failed to prove that SMG had a legal duty to have personnel present to control the number of persons accessing the elevators, that SMG breached any applicable standard of care' or code requirement, and; that any act or omission by SMG was a legal cause of the elevator malfunction. SMG also argues that the trial court erred in failing to find any comparative fault on the part of plaintiffs or-any of-the other occupants of the elevar tor. i
 Negligence is analyzed under a duty-risk analysis. McCloud v. Housing Auth. of New Orleans, 2008-0094, p. 3 (La.App. 4 Cir. 6/11/08), 987 So.2d 360, 362, A duty-risk analysis includes five elements that a plaintiff is required to prove: (1) proof that the defendant had a duty to conform his conduct to' a specific standard (the duty element)-; (2) proof that the defendant’s conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the Cause-in-fact element); (4) proof that the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and (6) proof of actual damages (the damages element). Long v. State ex rel. Dept. of Transp. and Dev., 2004-0485, p. 21 (La.6/29/05), 916 So.2d 87, 101, citing Bonin v. Ferrellgas Inc., 2003-3024 p. 5 (La.7/2/04), 877 So.2d 89, 94; Perkins v. Entergy Corp, 2000-1372 p. 7 (La.3/23/01), 782 So.2d 606, 611; and Boykin v. La. Transit Co., Inc., 96-1932, pp. 8-9 (La.3/4/98), 707 So.2d 1225, 1230.
“Duty is a question of law and subject to a de novo standard of review.” Zacher v. Harrah’s New Orleans Mgmt. Co., 2013-1237, p. 17 (La.App. 4 Cir. 2/12/14), 136 So.3d 132, 144. “Factual findings — including breach of duty, cause-in-fact, legal causation, and actual' damages — áre subject to the mánifest error standard of review.” Id., citing Watters v. Dept. of Social Servs., 08-0977, pp. 15-16 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1142.
As a general rule, the owner or operator of a facility has the duty to exercise reasonable care for the safety of persons on its .premises and the duty to not expose such persons to unreasonable risks of injury or harm, Manning v. Dillard Dept. Stores, Inc., 99-1179 (La.12/10/99), 753 So.2d 163, 165; Mundy v. Dept. of Health and Human Res., 620 So.2d 811, 813 (La.1993).
In finding SMG negligent in this matter, the trial court found that SMG’s duty to its patrons included the specific duty to properly control the operations of its elevators and control the number of *659 persons accessing the elevators after events. The trial court based this finding on the fact that overcrowding of Super-dome elevators after an event was a known problem. In its' reasons for judgment, the trial court noted that despite having notice of problems with' overcrowding and prior [ 7instances of elevator malfunction due to overcrowding, SMG did not put an attendant or any plan in. place to monitor or control the crowds entering elevators.
•
Dr. Wade Schindler, an expert in event security, loss prevention and risk management, offered his opinion that SMG had a heightened duty of care given the fact that it is responsible for tens of thousands of patrons during football games and other events, with many of those patrons drinking alcoholic beverages throughout the events. He further opined that to expect event patrons to monitor the number of persons gaining access to elevators after an event is unrealistic and a threat to the safety and security of the patrons and the establishment. Dr. Schindler stated that in a public facility with the capacity of the Superdome, and with overloading of the elevators being a known problem, SMG should have had employees managing access to the elevators to control egress and ingress to the floors.
We do not find the trial court erred in finding that SMG owed its patrons a duty to properly control the operations of its elevators and control the number of persons accessing the elevators after events. We further And no error in the trial court’s conclusion that SMG breached this duty.
SMG cites two cases in support of its argument that the trial court erred in finding it had a duty to control the elevator operations and control the number of persons accessing the elevators after events. Those cases are Zacher v. Harrah's New Orleans Mgmt. Co., supra, and Fleming v. Hilton Hotels Corp., 99-1996 (La.App. 4 Cir. 7/12/00), 774 So.2d 174. In those cases, this Court held that the defendant businesses owed no duty to provide security to prevent an unforeseeable |sor unexpected accident from occurring. Zacher, 2018-1237, p. 29, 186 So.3d at 151; Fleming, 99-1996, pp. 5-6, 774 So.2d at 178. We And the Zacher and Fleming cases distinguishable from the instant case.
•Here, it was not' an unforeseeable event for an overcrowded elevator in the Super-dome to malfunction. In the 2½ year period prior to this accident on December 16, 2007, there were at least two other incidents of Superdome elevators being overcrowded and malfunctioning. One such event occurred at the Essence Festival in July 2005, and another occurred in October 2007, just two,months before the incident at issue.
John Simon, who worked for SMG as an elevator mechanic in the Superdome from approximately 1984 to 2005, and then returned to that employment in 2011, testified by deposition about the incident that occurred at the Essence. Festival in 2005. He said an elevator that was overloaded malfunctioned, and 30 patrons were stuck ■in the elevator. No one was injured in that incident, and the incident was brought to the attention of the engineering department. Douglas Whittington, Jr., testified by deposition that he began working for SMG in 2006, and is in charge of maintenance and repairs on elevators and escalators at the Superdome. He testified about an incident on October 21, 2007, where an overloaded elevator got stuck between two floors, trapping .people inside the elevator. He said that, to his knowledge, no .one was hurt in that incident.
While the Zacher • and Fleming cases cited by SMG establish that a facility operator’s duty of reasonable care to its patrons does not extend to unforeseeable *660 |Bacts, the situation in this case is different in that SMG knew or should have known that elevators in the Superdome had previously malfunctioned due to being overcrowded, This risk, then, was foreseeable. The trial court apparently found it immaterial that the prior incidents of malfunction due to overcrowding involved different elevators in the Superdome than the one involved in this accident. And we agree. The court found that the risk of an elevator malfunctioning was foreseeable and therefore SMG had a duty to protect patrons from this risk.[2] We find no error on the part of the trial court.
Having found that the trial court did not err in finding that SMG breached its duty of care owed to plaintiffs, we turn to the issue of causation. Plaintiffs all testified as to the injuries they suffered as a result of being in an elevator that dropped several floors and crashed, with the ceiling tiles of the elevator and other objects falling on their heads. Each plaintiff also presented testimony of medical professionals relating injuries they suffered to the elevator crash. The trial court found that SMG’s negligence was a cause-in-fact of plaintiffs’ injuries. We find no error in that conclusion of the trial court.
The record also supports the conclusion that SMG’s substandard conduct was a legal cause of the plaintiffs’ injuries. As stated above, we do not find that the tidal court erred in finding that SMG had a duty to properly control the operations' of its elevators and control the number of persons accessing the hnelevators after events. The breach of this duty was a legal cause of the plaintiffs’ injuries.
The fifth and final element of the duty-risk analysis is proof of actual damages. Although SMG disputes certain amounts awarded to plaintiffs, the record .includes substantial evidence that the plaintiffs suffered damages as a result of the December 16,2007 elevator accident.
Because plaintiffs carried their burden of proving each element of the duty-risk analysis as to their negligence claims against SMG, the trial court did not err in finding.-SMG liable to plaintiffs for injuries suffered in -the elevator accident. .
We also find that the trial court did not err in finding no comparative fault on the part of the plaintiffs for this accident. SMG argues that there was a sign posting weight and occupancy limits on the elevator that plaintiffs boarded. The trial court was presented with conflicting testimony on this issue. SMG points out that Thomas Keller, plaintiffs’ expert in elevator electrical and mechanical operation, testified that the elevator at issue had a sign that posted a weight limit of 3,000 pounds and an occupancy limit of 14 persons. However, Keller testified that his inspection of this elevator occurred on August 2, 2012, several years after the accident. When shown a photograph of the sign stating weight and capacity limits, Mr. Keller could not say whether the sign was there on' the date of the accident. Douglas Whittington, the SMG employee in charge of maintenance and repairs on elevators and escalators, stated in his deposition that he could not say that the signs were in the elevator on December 16, 2007. In contrast to this testimony by Keller Inand Whittington, all, three plaintiffs testified that on the day of the accident, they did *661 not see any sign regarding a weight limit or number of people allowed on the elevator.
Randy Philipson, the Director of Engineering for SMG at the time of the accident, testified by deposition that SMG uses elevator attendants for large events, such as Saints games, and their duties include ensuring that patrons get to the floor they are trying to reach and regulating the number of people who get on elevators. However, Maria Jones, the SMG supervisor in charge of ushers who acted as elevator attendants at Superdome events, testified in her deposition that she has never been advised of elevator' capacity limits and was not aware of any instructions given to attendants to prevent overcrowding of the elevators.
The plaintiffs’ testimony is uncontrovert-ed that on the date of the accident, there was no elevator attendant, on the elevator that malfunctioned or any posted sign indicating the capacity limit for the elevator. They also testified that no elevator attendant was present outside of the elevator when they boarded. The testimony at trial established that plaintiff Jocelyn Burch was the one of the first people to step onto the elevator, and plaintiffs Keela James and Kizzy Stamps followed Ms. Burch into the middle of the elevator. We find that ta hold plaintiffs responsible for monitoring how many other occupants entered the elevator after they had already boarded would be both unreasonable and impractical. Based on the evidence presented, we find no error in the trial court’s finding that plaintiffs bear no comparative fault for the accident. There is also insufficient evidence in 112this record to assess comparative fault for this accident to any of the other occupants of the elevator.
DAMAGES
■ SMG argues that the plaintiffs did not prove their entitlement to each and every element of damages awarded. Specifically, SMG argues that the awards.for past lost wages should not have been awarded to any of the three plaintiffs, that future lost wages and future medical expenses should not have been awarded to Jocelyn Burch and Kizzy Stamps and that the trial court awarded excessive amounts to all three plaintiffs for past, present and future pain and suffering. In their answer to the appeal, plaintiffs argue that the amounts awarded to them should be increased because the awards do not adequately compensate them for their damages.
SMG also stated in its issues presented for review that the trial court applied the wrong date for the calculation of judicial interest. ‘ However, SMG did- not brief the argument regarding judicial interest. Thus, it is deemed abandoned. See, Uniform Rules — Courts of Appeal, Rule 2-12.4(B)(4).
“The applicable standard of review for a factual finding is the manifestly erroneous or clearly wrong standard.” S.J. v. Lafayette Parish School Bd., 2009-2195, p. 12 (La.7/6/10), 41 So.3d 1119, 1127. To reverse a factfinder’s determination, under this standard of review, the appellate court must review the record in its entirety and (l).find that a reasonable factual basis -does not exist for the finding, and (2) must further determine that the record establishes that the 1 ^factfinder is clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993).
La. Const. Art. V. § 10(B), which, provides that the appellate jurisdiction of a court of appeal extends to law and facts, has been interpreted as giving an appellate court the power to decide factual issues de novo. Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 3 (La.2/20/95), 650 So.2d 742, 745. “The exercise of this power is limit *662 ed, however, by the jurisprudential rule of practice that a trial court’s factual findings will not be upset unless they are manifestly erroneous or clearly wrong.” Ferrell, 94-1252, pp. 3-4, 650 So.2d at 745. “Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, Whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.” Ferrell, 94-1252, p. 4, 650 So.2d at 745, citing Rosell v. ESCO, 549 So.2d 840 (La.1989); Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (La.1975).
In our consideration of the arguments relating to the amount of the damages awarded to each plaintiff, we are. guided by the following legal precepts: To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question. Boyette v. United Servs. Auto Ass’n., 2000-1918, p. 3 (La.4/3/01), 783 So.2d 1276, 1279. A trial court has broad discretion in assessing awards for lost earnings,' but there must be a factual basis in the record for the "award. Driscoll v. Stucker, 2004-0589, p. 29 (La.1/19/05), 893 So.2d 32, 53. “The amount of lost earnings need not be proved with mathematical | ucertainty, but' by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiffs own testimony.” Id.
“A plaintiff may ordinarily recover reasonable medical expenses,. past and future, which he incurs as a result of an injury.” Laurrence v. Govt. Emps. Ins. Co., 2013-1296, p. 34 (La.App. 4 Cir. 10/15/14), 151 So.3d 917, 937, writ denied, 2014-2382 (La.2/6/15), 158 So.3d 821, citing White v. Longanecker, 93-1122 (La.App. 1 Cir. 5/23/94), 637 So.2d 1213, 1218. It is the plaintiffs burden of proving the future medical expenses will more probably than not be-incurred. Hobgood v. State Farm Mut. Auto Ins. Co., 2014-0581, p. 10 (La. App. 4 Cir. 12/17/14), 156 So.3d 1244, 1251.
General damages, including pain and suffering, are inherently speculative in nature and cannot be fixed with mathematical certainty. Wainwright v. Fontenot, 2000-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. A trial court’s assessment of the appropriate amount of general damages is entitled to great deference on review. Id.
As to Jocelyn Burch and Keela James, we find no error of law or fact as to the awards of damages. As to Kizzy Stamps, we find an error of fact in the amount awarded for past lost wages. .All will be discussed below.

Jgcelyn Burch

Jocelyn Burch was awarded $350,000.00 for past, present and future pain and suffering; $149,527.00 for past lost wages; $76,047.15 for -past medical expenses; $103,181.80 for future medical expenses; $193,872.00-for future lost |1F,wages; and costs of $9,469.57. SMG argues that Ms. Burch did not prove her entitlement to awards for past lost wages, future lost wages or future medical expenses. SMG also claims that the amount awarded to Ms. Burch for pain and suffering is excessive. In the answer to SMG’s appeal, Ms. Burch argues that she is totally disabled from working because of injuries related to the accident, and the amount awarded to hér does not adequately compensate her for her losses. ' >
Immediately' following the accident, Ms. Burch was taken by ambulance to East Jefferson Hospital in Metairie,' and complained of pain in her neck, back and knees. She was examined and had x-rays taken, and the emergency room records noted that Ms. Burch had cervical and lumbar sprain, contusion of the scalp and a *663 sprained right knee. She was advised to seek further care from her primary care physician. Ms. Burch testified at trial that she had never received, treatment for neck, back or knee injuries before this accident.
Ms. Burch, testified that she received chiropractic treatment after the accident, but it only provided temporary pain relief. Ms. Burch began treatment with Dr. Bradley Bartholomew, a neurosurgeon,- in April 2008, for continued complaints of neck and back pain,,which started with the elevator accident. , She also complained of headaches and occasional numbness in both arms and in her hands. A neck examination showed a significant amount of spasm on both sides with tenderness and a normal range of motion. Dr. Bartholomew testified that he reviewed an earlier MRI taken of Ms. Burch’s neck' in February 2008, which showed herniation at the C4-5 level effacing the spinal cord. He stated that Ms. |1fiBurch also had a straightening of the spine where it normally has a curvature, and that this was the, result' of spasm] He related her complaints of pain tó the elevator accident.
On October 28, 2008, Ms. Burch was involved in an automobile accident. At Ms. Burch’s December 2008 visit to Dr. Bartholomew, he ordered an MRI of her lower back. He testified that the MRI did not show any changes in the cervical spine, which indicated that the October 2008 car accident did not worsen Ms. Burch’s cervical condition.
Because Ms. Burch was still suffering severe neck pain and spasm at the December 2008 visit, Dr. Bartholomew recommended neck surgery, which would involve a two-level fusion with artificial discs. He stated that Ms. Burch’s need for surgery was because of injuries ’ suffered in the December 2007 elevator accident and not because of the October 2008 car accident. He estimated the cost of the surgery would be approximately $38,000.00 for him and his assistant, but that figure would not include the cost for the hospital and other physicians, which would probably be. an additional $60,000.00. Ms. Burch stated that the reason she has not had this surgery is because her insurance does not cover this procedure, which has not yet been approved by the. FDA.
Dir. Bartholomew also recommended deep- tissue massage therapy for Ms. Burch and prescribed muscle relaxers and pain medication. At her visit in August 2009, Ms. Burch’s condition' had worsened, with- constant neck pain, constant numbness in both arms, shoótihg pain down both arms and back '• pain. Dr. | ^Bartholomew saw Ms. Burch again in October 2010 and she was still in pain. Dr. Bartholomew testified that it would be in Ms. Burch’s best interest to have neck surgery because of her ongoing .pain. His opinion is that her condition would worsen over time, and that surgery would give her relief and reduce the risk of. further worsening her injury.
At her visit in September 2012, Ms. Burch told Dr. Bartholomew she had consulted Dr. James ’’Butler, an orthopedic surgeon, who had also recommended surgery for her injuries. Dr; Bartholomew stated that if Ms. Burch is 'approved for surgery after trial, she will need another MRI. He also recommended epidural steroid injections or facet block injections for back pain. He stated that if the injections were effective, he' would recommend that Ms. Burch have a rhizotomy procedure to provide relief for a longer period of time.' He described that procedure as á denervation of the joint. But Dr. Bartholomew stressed that a rhizotomy procedure should only be attempted after injections have been tried and proven effective. In her testimony on .this issue, Ms. Burch stated that she did not recall being advised *664 by Dr. Bartholomew about injections for pain relief and did not state that she would be willing to have such treatment in.the future.
In May 2008, Ms. Burch consulted Dr. Richard Meyer, an orthopedic surgeon. In his deposition, Dr. Meyer stated that Ms. Burch complained of neck, back, hand and feet pain, and'bilateral knee pain as a result of the elevator accident. Ms. Burch had MRI studies performed on both knees three months before her initial visit with Dr. Meyer. His impression was that Ms. Burch had 118meniscal tears in both knees. Dr. Meyer performed surgery on both of Ms. Burch’s knees on July 31, 2008. The surgery included an arthroscopy with partial lateral meniscectomy of both the left and right knees. She was prescribed pain medication and physical therapy after the surgery. Ms. Burch stated that she missed work from July 31, 2008 through October 1, .2008 as a result of the knee, surgery. .
Following the October 28, 2008 automobile accident, Ms. Burch again sought treatment from Dr. Meyer for injuries resulting from that accident. On February 5, 2009, Dr. Meyer performed arthroscopic surgery of Ms. Burch’s right knee, which he stated involved a different type, of tear than the one repaired on Ms. Burch’s right knee in the July 31, 2Q08 surgery. He said that the July 2008 surgery addressed a lateral meniscal tear, and the February 2009 surgery addressed a medial meniscal tear. Dr. Meyer stated that the knee injury suffered by Ms. Burch in the automobile accident was not related to the earlier injury from the elevator accident. His opinion is that the elevator accident caused the injuries to Ms. Burch’s knees that required the July 31, 2008 surgery. Dr. Meyer assigned a 10% impairment rating as to both of Ms. Burch’s knees.
Dr. Meyer stated that now that Ms. Burch has undergone arthroscopic surgery on her knees, the knee injuries she suffered in the accident should not prevent her from returning to the job she held at Harrah’s prior to the accident. However, when asked about her neck injury, Dr. Meyer stated that while standing should not bother Ms. Burch’s neck, her neck injury could limit her ability to work |19if she has to turn her head from side to side on a repeated basis as part of her job as a table games dealer.
Ms. Burch testified that she saw Dr. James Butler, an orthopedic surgeon, several times starting in 2011. According to Ms. Burch, Dr. Butler ordered an MRI and recommended surgery for Ms. Burch’s neck but Ms. Burch testified that she could not afford the deductibles and co-payments. She testified that she wanted to see Dr. Butler again after the trial to explore having the neck surgery he recommended.[3]
Ms. Burch sought .treatment from Dr. Daniel Trahant, a neurologist, in October 2011. Dr. Trahant stated in his deposition that Ms. Burch was unable to obtain medical leave from .her employment to have surgery, so Dr. Butler referred Ms. Burch to him for conservative pain management. The record shows Ms. Burch was still being treated by Dr. Trahant shortly before trial in 2014.
Dr. Trahant stated that Ms. Burch’s complaints of neck pain and radiating pain in the neck area indicated the need for an EMG/nerve conduction study. An MRI performed in July 2011 revealed a posteri- or herniation of the C5-6 disc. When *665 comparing the 2011 MRI to a 2008- MRI, Dr. Trahant found a slight worsening of the degree of herniation of the C5-6 disc. There was also a bulging of the C4-5- disc and loss of cervical lordosis, which he stated is a finding often compatible with cervical muscle spasm that he also found on examination. Dr. | ^Trahant recommended cervical spinal surgery for a herniated disc at the C5-6 level. He related the need for this surgery to the elevator accident, and not to Ms. Burch’s subsequent automobile accident. Dr. Trahant stated that he would not perform the surgery because he is not a surgeon. He described the future medical care Ms. Burch will require after she has surgery. He stated that she will continue to have neck pain on a daily basis if she does not have surgery for the herniated disc.
Prior to the December 2007 accident, Ms'. Burch was employed by Harrah’s Casino in New Orleans as a table gámes dealer. She started that job in April 2005. The knee surgery in July 2008 caused her to miss two months of work. She also used her leave time she had under the FMLA,[4] but had to return to work once that leave time had been exhausted. Ms. Burch said she was told by her employer that if she needed more time off for surgery, she had to resign her employment and could return only as a part-time dealer with no benefits. At the time of trial, Ms. Burch had been on short term disability for two months. She acknowledged that her employer was paying 65% of her salary at the time of trial as a result of a disability policy she purchased. She testified that her lost wages since the accident had totaled between $160,000.00 and $180,000.00.
Ms. Burch testified as to how the injuries she suffered in the elevator accident have affected her life. She said she 'has difficulty standing at work, her hands and legs become numb and she has difficulty walking to her car after work. She cannot do many of the activities she previously enjoyed such as cooking, |21 shopping, dancing and going to amusement parks with her granddaughter. She said she is in constant pain despite taking pain medication, and has trouble sleeping. Ms. Burch said she missed so much work that she had to get a loan from a finance company in order to pay her bills. When she was unable to repay the loan, the finance company sued her and she currently has a $91,000.00 judgment against her.
Dr. Aaron Wolfson, an expert in vocational assessment and analysis of future medical expense's, met with Ms. Burch on October 1, 2012. He provided a detailed written report, which was admitted into evidence. His opinion is that Ms. Burch’s vocational prognosis is guarded, given the recommendation of Surgery by Drs. Bartholomew and Butler; He' stated that because of Ms. Burch’s current physical condition, which includes ’the need for pain medication, frequent breaks and alternating her physical position to manage her pain, Ms. B.urch is better suited for part tóme or less physically demanding work than her position as a gaming dealer requires. Dr. Wolfson further stated that if Ms. ■ Burch undergoes the recommended surgery, she will be removed from the labor market for a period of recovery and rehabilitation, which will result in a total loss of expected earnings during that time period. He provided estimates of the costs of future medical expenses likely to be incurred by Ms. Burch for injuries related to the elevator accident. '
Shannon Lavigna-Maneou, who works in Human Resources at Harrah’s, testified that as a dealer, Ms. Burch would receive *666 tokes in addition to her base |22pay. She said toke is the term casinos use instead of tip because casino employees working at tables deal with chips instead of cash. She identified a report, which estimated the amount Ms. Burch lost in tokes from days she was absent from work from December 28, 2007 through February 14, 2014. This report, referred to at trial as the “Toke Report,” was admitted into evidence. Based on this report, Lavigne-Maneou estimated that Ms. Burch lost $133,573.05 in tokes.
■ Dr. Randolph Rice,' an expert in economics and medical cost analysis, was retained to do an analysis of Ms. Burch’s past and future lost earning and medical costs. After reviewing documents regarding Ms. Burch’s wages and missed tokes, Dr. Rice concluded that Ms. Burch had past loss earnings of $149,527.00. As for Ms, Burch’s future lost wages, Dr. Rice stated that he considered the information in Dr. Wolfson’s report, including Dr. Wolfson’s conclusion that Ms. Burch’s injuries from the elevator accident preclude her from returning to her job as a gaming dealer. Dr. Rice stated that the present value of the difference between the earnings in her job as a gaming dealer and alternativé employment for which she would be suited is $193,700.00.
Dr. Rice gave wide-ranging estimates of Ms. Burch’s future medical expenses, which also factored in whether or not she would have one or more rhizotomy procedures for pain relief. His estimates of these future expenses ranged from $274,104.00 to $1,130,721.00, and were based on the assumption that the information contained in Dr. Wolfson’s report is correct.
| 2sMs. Burch testified that she wants to have the recommended neck surgery to relieve her pain but has not done so yet because she has lacked the financial resources. The amount of the award to Ms. Burch for future medical expenses, $103,181.80, is supported by evidence in the record regarding the costs of the neck surgery and follow-up treatment associated with that surgery. We find no error.
We find no merit in Ms. Burch’s argument in her answer to the appeal that her award of future medical expenses should be increased. Although Dr. Rice’s estimate of future medical expenses was larger than the amount awarded, the trial court did not err in awarding only the amount representing the approximate cost of the recommended surgery and follow-up treatment for that surgery. Ms. Burch testified that she wanted to pursue neck surgery, but she did not indicate that she was interested in or willing to undergo the other procedures and treatments outlined in Dr. Wolfson’s report, which Dr. Rice relied upon in arriving at his estimate of future medical expenses.
We find no error in the trial court’s award to Ms. Burch for past and future lost Wages. There is sufficient evidence in the record to support these awards. Furthermore, given the evidence presented regarding Ms. Burch’s injuries related to the accident and how those injuries have affected her life, and considering the deference'accorded to the trial court in the award of general damages, we do not find that the trial court erred in the amount of its award to Ms. Burch for past, present and future pain and suffering.

Keela James

| ?4Keela James was awarded $200,000.00 for past, present and future pain and suffering; $84,586.47 for past lost wages; $15,381.26 for past medical expenses; and costs of $4,950.82. SMG argues that the trial court erred in awarding lost wages to Ms. James, and further argues that the *667 amount awarded to her for past, present and future pain and suffering is excessive. In the answer to SMG’s appeal, Ms. James argues that she is entitled to additional general and special damages due to the severity of her medical condition and significant lost wages.
Ms. James traveled' from her home in Florida to New Orleans in December 2007 to attend a Saints game. Following the elevator accident on December 16, 2007, Ms. James was taken to the emergency room at Tulane Hospital. She testified that she refused to get x-rays or an MRI because getting to the area of the hospital where those tests are performed required using an elevator. She was advised by the emergency room physicians'to seek‘treatment when she returned home to Florida.
After the accident, Ms. James sought treatment from her primary care physician who had treated her for lymphedema in her left leg before the accident. According to Ms. James, her pre-existing condition of lymphedema was manageable while she worked as a manager at a Walgreen’s store before the accident, but the accident aggravated her condition and she has been unable to work since that time. Ms. James testified that she told her primary care physician about the elevator accident, and complained of pain in her head, neck, shoulders, back and left leg.
lafiWhen Ms. James was in Georgia two weeks after the accident, she sought treatment at an emergency room due to pain, and swelling in her left leg. Dr. Dorsey Smith admitted Ms. James to the Gebrgia hospital, and released her three days later with final diagnoses of cellulitis (an infection that can result from lymphedema) and phlebitis of the left lower extremity. It was Dr. Smith’s opinion that the treatment he rendered to Ms. James .was causally l’elated to the accident in the elevator.
Ms. James was treated by Dr. Gregory Iseman, a chiropractor, for approximately eighteen months, and she testified that she received temporary relief with his treatments. Dr. Iseman stated at his deposition that Ms. James complained of neck and low back symptoms, which in his opinion were most likely related to the compression of falling straight down in the elevator. He stated that Ms. James also injured her right shoulder as she was trying to climb out of the elevator.. Dr. Ise-man’s opinion is that Ms. James’ pre-exist-ing lymphedema condition was aggravated by the elevator accident.
Dr. Iseman referred Ms. James to Dr. Floyd Jaggears,-an orthopedic surgeon, who first saw Ms. James on July 9, 2008. She told Dr. Jaggears that she had injured her right shoulder in the elevator accident of December 16, 2007. She told him that she had never previously injured her shoulder. An MRI revealed acromioclavi-cular hypertrophy with impingement (changes where the collarbone connects to the tip of the shoulder), tendinopathy (tendon injury) and possibly a partial tear.. In his deposition, Dr. Jaggears said the conditions of tendinopathy and (impartial tear were, consistent with a traumatic event. He first tried conservative treatment, which offered some pain relief. He performed right shoulder arthroscopic surgery on Ms. James on October 10, 2008. In the surgery, Dr. Jaggears found a definite rotator cuff tear in addition to other injuries to cartilage. He related these injuries to the elevator accident, and assigned Ms. James a 5-6% permanent impairment-after the surgery.
•Ms. James testified at trial that the shoulder sdrgery was beneficial to her, but she still has pain in her neck, back, leg and left shoulder. Ms. James stated that after ,the right shoulder arthroscopy, she consulted with Dr. Keith Banton, a general *668 practice physician, and with Dr. Thomas Mitchell, an orthopedic surgeon referred to her by Dr. Banton. As of the trial, Ms. James still continued to have pain in her neck, back, legs and shoulders. She has also sought treatment beginning in October 2012 for panic attacks.
Prior to the accident, Ms. James worked as a manager at a Walgreen’s store in Florida. On May 2, 2008, Ms. James was granted Social Security disability because of chronic lymphedema. In an undated document, the Social Security Administration notified Ms. James that a subsequent review of her case resulted in the determination that her period of disability would end in August 2012 because her condition was not as severe as it was when she was granted disability in 2008. The document from the Social Security Administration acknowledged that Ms. James’ impairment is still severe, and that her physical impairments reduce her liability to function. However, the Social Security Administration found that Ms. James’ condition had improved and she could perform sedentary work.
Dr. Kenneth Boudreaux, an expert economist, testified that he considered Ms. James’ earnings at Walgieen’s prior to the accident, and calculated her past lost earnings at $190,712.43 through September 9, 2013. He stated that his calculation was based on the assumption that Ms. James has not earned any income since the accident. Ms. James testified'that she has not worked since the accident.
In reasons for judgment, the trial court found that Ms. James’ cellulitis and hospitalization for this condition after the accident and the Social Security disability findings are unrelated to the December 2007 elevator accident. The trial court noted that Ms. James had- been hospitalized for lymphedema/eellulitis several times before the accident, and had sought treatment for this condition several days before the accident. Considering the evidence in the record as a whole, we cannot say the trial court erred in finding that Ms. James’ lymphedema/eellulitis condition was not related to the .elevator accident. We also cannot say, however, that the trial court erred in finding that Ms. James was entitled to an award for past lost wages from injuries she received in the accident.
As stated above, Dr. Boudreaux calculated Ms. James’ past lost wages at $190,712.43. The trial court only awarded Ms. James past lost wages of $84,586.47. This award is supported by the record.
While Ms. James’ lymphedema/eellulitis condition was found to be unrelated to the accident in the Superdome, the testimony supports a finding that | ^Ms. James sustained injuries to her rotator cuff, neck and back that were related to the accident.[5] The evidence further supports a finding that these injuries resulted in a loss of wages to Ms. James. We find no error in the amount awarded to Ms. James for past lost wages.
As for the trial court’s award to Ms. James for past, present and future pain and suffering, we find no manifest error, noting the great deference accorded to the trial court in the award of general damages.

Kizzy Stamps

.Kizzy Stamps was awarded $400,000.00 for past, present and future pain and suffering; $113,100.00 for past lost wages; $36,844.00 for past medical expenses; $80,869.14 for future medical expenses; *669 $139,286.15 for future lost wages; and costs of $5,076.32. SMG argues that Ms. Stamps did not prove her entitlement to awards for past lost wages, future lost wages or future medical expenses, SMG also claims that the amount awarded to Ms. Stamps for pain and suffering is excessive. In the answer to SMG’s appeal, Ms. Stamps argues that she is entitled to additional general and special damages due to the severity of her medical condition and significant lost wages.
We find the trial court’s award to Ms. Stamps is fully supported by the record in all elements of damages except for the award of past lost wages. For Ms. Stamps’ past lost wages, the trial court awarded $113,100.00. This award, as |g9calculated by the- economist, Dr. Kenneth Boudreaux, was based on the assumption that Ms. Stamps was unable to work from the time of the accident until trial. However, that assumption was erroneous; Ms. Stamps testified that she had worked at certain times during this period. Accordingly, income earned by Ms. Stamps from the time of the accident until- trial must be deducted from the award for past lost wages. • -
Ms. Stamps was injured in the elevator accident after traveling from Florida to New Orleans for the Saints game on December 16, 2007. Following the accident, Ms. Stamps was taken by ambulance to the emergency room at Tulane Hospital. She complained of head, neck and'back pain and was put in a neck brace. She testified that x-rays were taken, and she was told she injured her lower back and should seek further medical treatment when she returned to Florida.
In Florida, Ms. Stamps received treatment from a chiropractor for several months, but this treatment provided only temporary pain relief. Ms. Stamps’ primary care physician referred her to Dr. Mark Cuffe, a neurosurgeon. In his deposition, Dr. Cuffe stated that he first saw Ms. Stamps on February 2, 2009. She complained of pain in her lower back and right leg, which began immediately after the elevator accident. He reviewed an MRI of Ms. Stamps’ lumbar spine, which had been performed on December 30, 2008. The MRI showed a large disc herniation on the right at the L5-S1 disc space, which Dr. Cuffe felt was compressing Ms. Stamps’ SI nerve root. He said the compression of the nerve root is called a radi-culopathy, and his opinion is that is what was causing pain 13ndown Ms. Stamps’ right leg and tingling and numbness in her right leg, foot and toes. Because earlier conservative treatments had not significantly helped Ms. Stamps, Dr. Cuffe offered her two options: L5-S1 epidural steroid injections or surgery to remove the disc herniation.
Ms. Stamps testified that because her pain had become unbearable, she elected to have surgery to remove the disc herniation, which was performed on February 3, 2009. Dr. Cuffe said the surgery was a right L5-S1 hemilaminectomy and medial facetectomy. During surgery, he found a large, disc herniation compressing a nerve root. Dr. Cuffe said that Stamps reported improvement with her leg pain after surgery, but still complained to him of continued pain a couple of months after the surgery. He stated that Ms. Stamps was not at maximum medical improvement at that time. Ms. Stamps discontinued visits to Dr; Cuffe at the end of March 2009 because she lost her health insurance coverage. Dr. Cuffe said Ms. Stamps has a 10% whole person disability rating based on the fact that she had a surgically repaired lumbar disc herniation with some residual symptoms. He described certain medical treatments that might help Ms. Stamps if her pain continues. Dr. Cuffe’s *670 opinion is that Ms-. Stamps’, injury for which he performed surgery was related to the elevator accident. Ms. Stamps testified that if she had the financial ability to do so, she would seek further medical treatment' for her back complaints and would also consult a psychiatrist or psychologist for emotional problems resulting from the accident. ■
|3TShe also described, how .injuries from the accident have affected her life. After having a baby (she became pregnant after the accident), her mother moved in with her to help her because she was unable to hold the baby or do anything for herself. She can no longer participate in activities she used to enjoy such as dancing and playing sports. She said at one point, the pain from her injuries was so bad she considered suicide.
Prior to the accident, Ms. Stamps worked as a sales associate at a Macy’s store in Florida' earning $7.25 per hour plus commissions. She left that job in September 2008 and did not work again until March or June of 2011 when she began a job at a Macy’s store in Texas, earning $9.00 per hour.[6] However, her back pain prompted her to leave that job in November 2011. She started a part-time job at a Chico’s store in Houston in March 2012, earning $8.50 per hour plus commissions, but left that job in October 2012 because of back pain. She moved to New Orleans in October 2013 and started working part time at Macy’s for $8.95 per hour, and" was still working there at the time of trial. However, she stated that Dr. Najeeb Thomas has advised her to switch to light duty sedentary work because of her physical limitations.
Dr. Wolfson evaluated Ms, Stamps for the purpose of developing a vocational rehabilitation assessment and future médical cost projection. In his report, he noted the amounts earned by Ms. Stamps before and after the accident, and also considered amounts she could earn in alternate occupations. Dr. Wolfson ^stated that Ms. Stamps may be better suited for part-time work due to postural limitations recommended by Dr. Thomas. Dr. Wolfson also offered a cost analysis associated with Ms. Stamps’ future medical care related to injuries suffered in the December 16, 2007 accident.
■ Dr. Boudreaux provided reports on Ms. Stamps’ lost wages and evaluation of future medical costs. He used' the cost estimates provided by Dr. Wolfson in his report, and determined that Ms. Stamps’ future medical expenses will range from $57,000.00 to $81,000.00. Dr. Boudreaux estimated that Ms. Stamps suffered a loss of past wages of at least $90,518.00 from the date of the accident until trial. He stated that after he prepared his report, he became aware that Ms. Stamps had worked in 2008, 2009 and 2010, but he did not have any data as to what she earned during those years.[7] However, he also stated that considering a wage of $9.00 per hour, Ms. Stamps would have earned $113,100.00 from the accident until trial. Dr. Boudreaux stated that both the minimum and maximum figures he assessed for Ms. Stamps’ past wage loss were not adjusted for any amounts Ms. Stamps actually earned during that time period. As for *671 future loss of earnings, Dr. Boudreaux: testified that if Ms. Stamps is able to return to work full time, she will suffer no future wage loss. If she continues with part-time work as she was doing at the time of trial, she will have a future loss of between $80,181.00. and $129,185.00. If she |⅛ unable to work at all, her future wage loss would be between $260,310.00 and $309,323.00.
While we find that the record supports the trial court’s award to Ms. Stamps for future lost wages, we find the award for past lost wages must be reduced because the trial-court committed manifest error in awarding an amount for past lost wages that was based on the admittedly incorrect assumption that Ms. Stamps had not worked since the accident. We will determine an appropriate award for this item of damages' based on a de novo review of the record. - . ,
As stated above, Dr. Boudreaux admitted that in calculating the amount of "past lost wages for his report on Ms. Stamps, he did not account for any amounts earned by Ms. Stamps from the time of the accident until trial. He testified at trial that after preparing his report, he became aware that Ms. Stamps had worked in 2008,2009 and 2010, but he had no data as to her actual earnings in those years.
The testimony of Ms.-Stamps and Dr. Boudreaux differed as to the dates when Ms. Stamps worked between- the time of the accident and trial. For purposes, of arriving at the reduced amount of past lost wages for Ms. Stamps, we accept' as true the general employment dates stated by Ms. Stamps in her testimony. Because we cannot state with certainty the amounts earned by Ms. Stamps during that period, we will estimate the amounts earned using evidence presented at trial to arrive at the figure for the reduced award of past lost wages.
" ■-At the trial in July 2014, Ms: Stamps testified that she worked full time after the accident in December 2007 until September 2008, and again from March or la4June 2011 to November 2011: She worked part time from March 2012 to October 2012, and from October 2013 until July 2014. Assuming a forty-hour work week for full-time work and a twenty-hour work week for partrtime work, we estimate Ms. Stamps worked a total of approximately 3,840 hours between the date of the accident and trial. Assuming an average wage of $8.50 per hour, we estimate Ms. Stamps earned approximately $32,640.00 from the date-of; the accident in, December 2007 until .trial in July 2014. Accordingly, we reduce-the award for past.lost wages by this amount and award.. Ms. Stamps $80,460.00 for, this item of damages. .
 As for the award of $80,869.14 for future medical expenses, the record , includes Ms. Stamps’ testimony that she wants to seek further medical treatment for her injuries related to the accident if she has the financial ability to do so. SMG objects to,the fact,-that the award -for future medical expenses is not based upon testimony of physicians, but rather upon the future medical cost projection compiled by Dr. Wolfson and relied upon by Dr. Boudreaux in his estimate of Ms. Stamps’ future medical expense?.' Neither Dr. Wolfson nor Dr. Boudreaux is a physician. Dr. Wolfson is a vocational rehabilitation specialist, and Dr. Boudreaux is an economist.
This Court has rejected the argument that future medical expenses can only be established |,qRthrough the testimony of physicians. Cooper v. Bouchard Transp., 2012-0868, 2012-0869, 2012-0870, 2012-0871, p. 8 (La.App. 4 Cir. 3/27/13), 140 So.3d 1, 6. In the Cooper case, this Court affirmed an award of -future medical ex *672 penses established through the testimony of a vocational rehabilitation expert and forensic accountant, who based their conclusions on the plaintiffs’ medical records and the plaintiffs testimony. Id., pp. 8-10, 140 So.3d at 6-7.
Here, Dr. Wolfson, a vocational rehabilitation specialist, reviewed Ms. Stamps’ medical records and gave cost estimates for future medical treatment for injuries related to the elevator accident. Dr. Bou-dreaux used the cost estimates provided by Dr. Wolfson, and estimated that Ms. Stamps’ future medical care will cost- between $57,000.00 and $81,000.00. The amount awarded for future medical expenses was within the range stated by Dr. Boudreaux. Given these expert reports, and the plaintiffs testimony that she wants to seek further medical treatment for her injuries related to the accident if she has the financial ability to do so, we cannot say that the trial court erred in the amount awarded to Ms. Stamps for future medical expenses. Furthermore, given the great deference accorded to the trial court in the assessment of general damages, we find no error in the amount awarded to Ms. Stamps for past, present and future pain and suffering.
For the reasons stated above, we amend the trial court judgment to reduce Kizzy Stamps’ award for past lost wages to $80,460.00. In all other respects, the trial court judgment is affirmed.[8]
AMENDED, AND AS AMENDED, AFFIRMED

. This litigation originally included other plaintiffs and defendants, but at the time of trial, the only claims that had not been resolved were those of plaintiffs, Jocelyn Burch, Kizzy Stamps and Keela James, against defendant, SMG.

. Plaintiffs argued for strict liability alleging that the elevator was defective due to inadequate maintenance. The trial court denied this claim finding that the inadequate maintenance was not the cause-in-fact of the plaintiffs’ injuries, W§ point out, however, that there is no cause of action for strict liability in this instánce. La. C.C. art. 2317.1 provides for a negligence theory of recovery against the owner or custodian of a defective thing.

. Dr. Butler did not testify at trial, and the record does not include a deposition or report by Dr. Butler. Dr. Butler’s billing summary is included as án exhibit, and confirms that Ms. Burch consulted him on June 22, 2011.

. Family and Medical Leave Act.

. In determining an award for past lost wages, the trial court appropriately deducted from the economist's calculations the amount earned by Ms. James in Social Security disability benefits from the accident until the time of trial'.

. A review of the testimony of Ms.' Stamps and Dr, Boudreaux and the report of Dr. Wolfson reveals conflicting evidence regarding the dates Ms, Stamps has worked since the accident.

. We note that these dates conflict with the dates given by Ms, Stamps as to when she worked after the accident. Dr. Boudreaux testified that Ms, Stamps worked in 2008,' 2009 and 2010. ■ Ms.’Stamps testified that she did not work from September 2008 until March or June of 2011.

. Plaintiffs in their answer to appeal asked for additional general and special damages. Based on our review of the record, plaintiffs did not prove entitlement to additional damages. With the exception of the award of lost wages to Kizzy Stamps, the trial court did not err in the amounts awarded.